UNITED STATES of America, Appellee,

v.

Beryl ZYSKIND, Defendant–Appellant.

No. 1614, Docket 96–1770.

United States Court of Appeals,
Second Circuit.

Argued May 27, 1997.

Decided July 2, 1997.

Eric Bernstein, Assistant United States Attorney, Brooklyn, NY (Zachary W. Carter, United States Attorney, Emily Berger, Assistant United States Attorney, Brooklyn, NY, on the brief), for Appellee.

Nathan Lewin, Washington, DC (Ellen Fels Berkman, Kirsten D. Levingston, Miller, Cassidy, Larroca & Lewin, Washington, DC, Frederick P. Hafetz, Susan R. Necheles, Goldman & Hafetz, New York City, on the brief), for Defendant–Appellant.

Before: VAN GRAAFEILAND and KEARSE, Circuit Judges, and HAIGHT,

**114**

District Judge *.

KEARSE, Circuit Judge:

Defendant Beryl Zyskind appeals from a judgment entered in the United States District Court for the Eastern District of New York following a jury trial before Edward R. Korman, *Judge*, convicting him of bank fraud, in violation of 18 U.S.C. § 1344 ("Count I"); misappropriation of funds held as a fiduciary, in violation of 38 U.S.C. § 6101 ("Count II"); and theft involving federal funds, in violation of 18 U.S.C. § 666 ("Count III"). Zyskind was sentenced principally to 30 months' imprisonment, to be followed by a five-year term of supervised release. On appeal, he contends chiefly (1) that his conviction on Count III should be reversed because § 666 does not reach agents of organizations that are not direct beneficiaries of federal government benefits programs, and (2) that with respect to Count II, the district court gave erroneous instructions to the jury as to the role of a fiduciary. Finding no merit in any of his contentions, we affirm.

## I. BACKGROUND

In 1980, Zyskind became the administrator of Hi–Li Manor Home for Adults ("Hi–Li"), a facility licensed by the New York State Department of Social Services to provide care for adults who were handicapped or mentally impaired. In 1985, a Zyskind-owned company purchased the Hi–Li building and the land on which it was situated.

Hi-Li was not a direct beneficiary of a federal funding program. However, at the time of the events in question, nearly all of Hi–Li's residents received federal benefits from the Social Security Administration or the Department of Veterans Affairs (formerly called the "Veterans' Administration," collectively herein "V.A." or "VA"). Some of these benefits checks were made payable directly to the residents; others were made payable to the Hi–Li administrator as legal custodian of the residents. Hi–Li applied the benefits payments it received towards the cost of room and board for each resident, and it maintained a record of the amount designated by the Department of Social Services as the individual's "personal allowance" money to which each resident was entitled.

Hi-Li entered the allowance amounts on what were referred to as the individuals' respective personal allowance account cards. During the period 1989–1991, Zyskind instructed the case manager at Hi–Li to reduce the balances on some of the personal allowance account cards maintained for Hi–Li residents, despite the fact that the residents had not actually withdrawn any money from their accounts. The case manager was directed to alter the account cards of certain residents, including those who never withdrew such money and those who were out of touch with reality, by entering starting balances on new cards that were lower than the closing balances on the prior cards.

In addition, in 1990, pursuant to an agreement with the V.A., described in greater detail in Part II.A. below, in which Hi–Li agreed "to receive and administer VA funds for the exclusive benefit of" one Charles Reno, Hi–Li received a V.A. check in the amount of $122,658 payable to "ADMINISTRATOR/HI–LI MANOR/CUST OF/C J RENO." When the check was received, Reno was no longer a resident at Hi–Li. Zyskind nonetheless instructed Hi–Li's bookkeeper to deposit the V.A. check into Hi–Li's general operating account, from which the funds were ultimately spent by Hi–Li for its own purposes.

In March 1995, Zyskind was indicted on charges of misappropriating, as a fiduciary, the funds belonging to Reno, in violation of 38 U.S.C. § 6101 (Count II), and embezzling federal funds belonging to other Hi–Li residents, in violation of 18 U.S.C. § 666 (Count III). He was also charged with bank fraud, in violation of 18 U.S.C. § 1344, in connection with his use of forged and fraudulent documents to obtain a bank loan in connection with refinancing the Hi–Li building and land (Count I). The jury convicted Zyskind on all

* Honorable Charles S. Haight, Jr., of the United States District Court for the Southern District of New York, sitting by designation.

counts, and he was sentenced as indicated above.

## II. DISCUSSION

On appeal, Zyskind principally contends, as he did in the district court, that Count III should be dismissed because 18 U.S.C. § 666—which applies only if the organization in question received more than $10,000 in federal benefits during a one-year period immediately before, after, or surrounding the offense—does not apply with respect to organizations that are not direct beneficiaries of federal government benefits. His other contentions include a challenge to the trial court's jury instructions as to the nature of a fiduciary's duties. We are unpersuaded by any of his contentions.

### A. *The Scope of § 666*

■ Section 666 of Title 18 provides, in pertinent part, as follows:

**§ 666. Theft or bribery concerning programs receiving Federal funds**

(a) Whoever, if the circumstance described in subsection (b) of this section exists—

(1) being an agent of an organization[ or other specified entity]—

(A) *embezzles, steals,* obtains by fraud, *or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that*—

(i) is valued at $5,000 or more, and

(ii) is owned by, or *is under the care, custody, or control of such organization,* government, or agency . . .

shall be fined under this title, imprisoned not more than 10 years, or both.

(b) The circumstance referred to in subsection (a) of this section is that *the organization* [ or other specified entity] *receives,* in any one year period, *benefits in excess of $10,000 under a Federal program* involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

18 U.S.C. § 666 (emphases added). "The term 'Federal program' means that there must exist a specific statutory scheme authorizing the Federal assistance in order to promote or achieve certain policy objectives." S.Rep. No. 98–225, at 370 (1983) ("Senate Report"), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3511; *see also United States v. Rooney,* 986 F.2d 31, 35 (2d Cir.1993) (relevant inquiry in determining whether federal funds constitute "benefits . . . under a Federal program" is "whether the funds disbursed can be considered Federal assistance within a specific statutory scheme intended to promote public policy objectives").

The jurisdictional elements necessary to support Zyskind's conviction on Count III, set forth in subsection (b) of § 666, were satisfied with evidence presented by the government in connection with Count II that Hi–Li received a V.A. check in payment for Reno. The statutory scheme under which Reno was to be paid $122,658 was plainly a "Federal program" within the meaning of the statute. *See, e.g.,* 38 U.S.C. § 301 *et seq.* (1988) (authorizing the payment of federal benefits to United States veterans), *recodified at* 38 U.S.C. § 1101 *et seq.* (1994). That scheme expressly envisions that the V.A. may pay the authorized benefits to a caretaker or custodian for the benefit of the veteran. *See, e.g.,* 38 U.S.C. § 3202(a)(1) (1988) ("payment of benefits under any law administered by the Veterans' Administration may be made directly to the beneficiary or to . . . some other person for the use and benefit of the beneficiary"), *recodified at* 38 U.S.C. § 5502(a)(1) (1994). Regulations promulgated to implement this scheme describe such a caretaker or custodian as the person who, in a fiduciary capacity, "receive[s]" the benefits. *See* 38 C.F.R. § 13.55(a) (1989) (V.A. official "is authorized to select and appoint . . . the person or legal entity best suited to *receive* Department of Veterans Affairs benefits in a fiduciary capacity for a beneficiary who is mentally ill (incompetent) or under legal disability . . . ." (emphasis added)).

Consistent with this statutory scheme, the form of agreement signed by Hi–Li with the V.A. in the present case with respect to Reno, entitled "Veterans Administration FI-

DUCIARY AGREEMENT," stated, in pertinent part, as follows:

> Under authority given by Congress, the Veterans Administration recognizes you as Legal Custodian to receive and administer VA funds for the exclusive benefit of ___, beneficiary, and the beneficiary's dependents, if any.

> ... monetary benefits you receive are not for your personal use. You are receiving these funds as a fiduciary, that is, in trust, for the benefit or use of the beneficiary....

> All monies not needed for the maintenance and upkeep of the beneficiary are to be placed in an interest bearing account at a State or Federally insured financial institution. A separate account is required for each beneficiary under your authority as Legal Custodian....

Following execution of the agreement with respect to Reno, the V.A.'s check for $122,-658 payable to "ADMINISTRATOR/HI–LI MANOR/CUST OF/C J RENO" was received by Hi–Li. Although when Hi–Li received the check Reno was no longer a resident at Hi–Li, Zyskind caused Hi–Li to deposit the check in its own account and to use the money for its own purposes.

■ Zyskind's contention that, because Hi–Li was not a "direct beneficiary" of federal government benefits, § 666 does not reach his organization is belied by the language of the statute and by its legislative history. Nothing in the language of § 666 suggests that its reach is limited to organizations that were the direct beneficiaries of federal funds. The jurisdictional subsection, (b), uses the word "receives," rather than the phrase "is a beneficiary of"; and the substantive subsection, (a), expressly reaches misappropriation not only of government moneys that were "owned by" the organization but also of moneys that came "under the care, custody, or control of [the] organization," 18 U.S.C. § 666(a)(1)(A)(ii). Nothing in this language suggests that § 666 does not reach thefts by an agent of an organization that receives federal program moneys and administers those moneys for the benefit of program beneficiaries.

■ The legislative history confirms that § 666 was intended to be broad. The section was enacted as part of an effort to "create new offenses to augment the ability of the United States to vindicate significant acts of theft, fraud, and bribery involving Federal monies that are *disbursed to private organizations* or State and local governments pursuant to a Federal program." Senate Report at 369, 1984 U.S.C.C.A.N. at 3510 (emphasis added). The purpose of the legislation was to "protect the integrity of the vast sums of money *distributed through* Federal programs from theft, fraud, and undue influence by bribery." Senate Report at 370, 1984 U.S.C.C.A.N. at 3511 (emphasis added); *see generally United States v. Foley*, 73 F.3d 484, 489–90 (2d Cir.1996) (reviewing the legislative history of § 666); *United States v. Rooney*, 986 F.2d at 34–35 (same). We conclude that § 666 was designed broadly to prevent diversions of federal funds not only by agents of organizations that are direct beneficiaries of federal benefits funds, but by agents of organizations to whom such funds are "disbursed" for further "distribut[ion]" to or for the benefit of the individual beneficiaries.

Zyskind's reliance on the Ninth Circuit's decision in *United States v. Wyncoop*, 11 F.3d 119 (9th Cir.1993), for the contrary view is misplaced. In that case, the government brought a § 666 prosecution against an employee of a college who had embezzled college funds. The college participated in a federal student-loan program that required it to "monitor the continued enrollment and eligibility of the loan recipients," *id.* at 120, but, although "banks often issue[d] the loan checks jointly to the student and to the school," *id.* at 120–21, the school itself "receive[d] no federal funds" directly, *id.* at 120. The *Wyncoop* court noted that § 666 "was not intended to cover thefts from institutions ... that do not themselves receive and administer federal funds," *id.* at 122, and that the college "itself received only the indirect benefits associated with increased enrollment of students receiving private loans," *id.* The court accordingly concluded that the statute was inapplicable because the college was "an entity that never received any federal funds under the loan programs." *Id.* Thus, on its

facts, *Wyncoop* is distinguishable from the present case. We note that, in instructing the jury in the present case, the district court excluded the fact pattern that would have paralleled *Wyncoop*. For purposes of the jurisdictional aspect of § 666, the jury was allowed to consider only those government benefits checks that were made payable to Hi–Li, not those that were made payable solely to the individual beneficiaries and later endorsed to Hi–Li.

We conclude that the district court properly ruled that to the extent that Hi–Li received directly from the government more than $10,000 in federal benefits checks payable to Hi–Li as custodian for the individual beneficiaries, it was an organization within the contemplation of § 666(b), and that Zyskind's misappropriation of federal benefits funds received by Hi–Li fell squarely within the scope of the conduct prohibited by § 666(a).

### B. *The Instructions on Fiduciary Duty*

■ We also reject Zyskind's contention that, in instructing the jury as to the role of a fiduciary in connection with Count II, the district court erred by defining fiduciary relationships in a manner that was inconsistent with the government's theory of the case and by using misleading hypotheticals. The district court instructed as follows:

The first element the Government must prove beyond a reasonable doubt is that Beryl Zyskind in his capacity [a]s administrator of Hi–L[i] Manor Home for Adults, had charge and custody in a fiduciary capacity of money paid by the Department of Veterans Affairs for an incompetent, Charles Reno.

A person acts in a fiduciary capacity when the money or property which he handles is not his own or for his own benefit, but for the benefit of another person, as to whom he stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other.

While a person can only become a[ ] fiduciary knowingly and voluntarily, he may, nevertheless, become a fiduciary in an implied, as well as an express, manner.

The difference between an express and implied undertaking can be demonstrated by hypothetical examples, taken from everyday life, that are unrelated to this case.

When a person promises to sell his car for $5,000, that is an express agreement which is legally enforceable. On the other hand, we often undertake obligations without expressly verbalizing a commitment. For example, if you walk into a restaurant, look at the menu and order a meal, you have, without explicitly saying so, agreed to pay the printed price for that meal. Similarly, when you take a taxi home from the restaurant, you have, without explicitly saying so, agreed to pay the taxi driver for the cost of the ride. These obligations arise from your actions because it is clear that in accepting the meal or the ride home, you knowingly and willingly obligate yourself to pay for them.

The same holds true for a fiduciary relationship. A fiduciary relationship may arise from an explicit agreement in which one person says, "I agree to act as a fiduciary." Even in the absence of an explicit agreement, a fiduciary relationship may arise when an individual comes into possession of another's money if it is clear from the nature of the relationship between the parties and the surrounding circumstances that the person accepting the money understands that he is obligated to deal with it as a fiduciary.

Accordingly, in order to find that the Government has satisfied the first element of Count 2, you must be satisfied beyond a reasonable doubt that [a] fiduciary relationship existed, whether express or implied, between Beryl Zyskind as administrator of Hi–L[i] Manor Home for Adults and Charles Reno, and that the defendant understood that the relationship placed upon him the duties of a fiduciary.

We see no basis for reversal in this charge. The agreement entered into by Hi–Li with the V.A. with respect to Reno had been signed, in Zyskind's absence, by Hi–Li's case manager, as she was authorized to do. The agreement identified the administrator of Hi–Li as the person who would act as fiduciary. The jury could thus find that Zyskind,

**118**

who held the position of administrator, was placed in the relationship of fiduciary with respect to the funds to be received on behalf of Reno, even though Zyskind did not personally sign the V.A. agreement. Accordingly, the instruction with respect to implied fiduciary relationships was not inappropriate. Nor were the court's hypotheticals with respect to implied undertakings in any way misleading in light of the charge as a whole.

## C. *Other Contentions*

■ Zyskind's other contentions include his argument that the government should have prosecuted him under 18 U.S.C. § 1014 rather than 18 U.S.C. § 1344 for making false statements on his loan application. This contention is meritless. "[A] defendant has no constitutional right to elect which of two applicable federal statutes shall be the basis of his indictment and prosecution...." *United States v. Batchelder,* 442 U.S. 114, 125, 99 S.Ct. 2198, 2205, 60 L.Ed.2d 755 (1979). "[W]hen an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants." *Id.* at 123–24, 99 S.Ct. at 2204. Thus, a defendant who makes false statements on a loan application may properly be prosecuted under either § 1344, the bank fraud statute, or under § 1014, the false loan application statute. *See, e.g., United States v. Seda,* 978 F.2d 779, 782 (2d Cir.1992). Zyskind has presented no basis for inferring that the government acted invidiously in electing to prosecute him under § 1344 rather than under § 1014.

## CONCLUSION

We have considered all of Zyskind's arguments on appeal and have found them to be without merit. The judgment of conviction is affirmed.