**UNITED STATES of America, Plaintiff,**

v.

**Robert C. LAHUE, d/b/a Robert C. LaHue, D.O. Chtd. d/b/a Blue Valley Medical Group,**

**and**

**Ronald H. LaHue, Defendants.**

Nos. 97–20031–01–JWL, 97–20031–02–JWL.

United States District Court, D. Kansas.

March 18, 1998.

Order Denying Reconsideration May 28, 1998.

Tanya J. Treadway, Office of U.S. Attorney, Kansas City, KS, for U.S.

Bruce C. Houdek, James, Millert, Houdek, Tyrl & Maloney, Kansas City, MO, for Robert C. LaHue, Robert C. LaHue, D.O. Chtd. and Blue Valley Medical Group.

Robert C. LaHue, Stillwell, KS, pro se.

James L. Eisenbrandt, Jeffrey D. Morris, Bryan Cave LLP, Overland Park, KS, for Ronald H. LaHue.

Ronald H. LaHue, Leawood, KS, pro se.

### MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

On June 11, 1997, a grand jury returned a sixty-three count indictment charging Drs. Robert C. and Ronald H. LaHue with conspiracy to defraud the federal government, program fraud, money laundering, witness

tampering,[1] and conspiracy to submit false Medicare claims. The money laundering counts (counts eleven through sixty-three) were subsequently dismissed at the government's request (Doc. 77).

The matter now comes before the court on the defendants' motion to dismiss counts one through eight, dealing with program fraud (Doc. 80), the defendants' joint motion to sever counts one through eight from count nine (Doc. 78) and Dr. Robert C. LaHue's motion to sever count ten from all other counts (Doc. 79). The court held a hearing on these matters on March 9, 1998, and is now prepared to rule.

For the reasons set forth below, the defendants' motion to dismiss is granted in part and denied in part. The motion is denied as to count one (conspiracy). The motion is granted as to counts two through eight (program fraud). The defendants' motions to sever are denied.

## I. Indictment

The indictment alleged that between 1984 and early 1995, the doctors, who are brothers, controlled Blue Valley Medical Group ("BVMG"). BVMG was a group of physicians that provided medical services to patients in nursing homes. Most, if not all, of these patients used funds derived from the federal Medicare program to pay for BVMG services. Dr. Robert LaHue was the president and Dr. Ronald LaHue was vice-president of BVMG.

The indictment alleges in counts one through eight that the defendants entered into a number of different sham "consulting agreements" with various hospitals. Under the agreements, the defendants received annual consulting "fees" from each hospital in amounts ranging from $50,000 to $150,000. The consulting agreements allegedly falsely gave the impression that hospitals paid the doctors for performing certain specified consulting duties. The true purpose of the agreements, the indictment alleges, was to bribe BVMG to refer patients to the hospi-

tals. The defendants allegedly did not render services under the agreements, nor did they intend to. The payments defendants solicited and received under the agreements allegedly do not represent the fair market value for any of the "consulting" services they rendered.

## II. Motion to Dismiss

Pursuant to Fed.R.Crim.P. 12(b), the defendants move to dismiss counts one through eight for lack of subject matter jurisdiction. Count one alleges the defendants conspired to commit program fraud or, in the alternative, that they conspired to defraud the United States. See 18 U.S.C. § 371. Counts two through eight allege the defendants committed program fraud. See 18 U.S.C. § 666(a)(1)(B).

### A. Standard

In ruling on a motion to dismiss, the court treats the allegations in an indictment as true and construes all facts in the light most favorable to the government. *United States v. Burger*, 773 F.Supp. 1430, 1433 (D.Kan.1991). The court views the indictment as a whole, with an emphasis on common sense, rather than technicalities. *United States v. Mobile Materials, Inc.*, 871 F.2d 902, 906–07 (10th Cir.), *modified on other grounds*, 881 F.2d 866 (10th Cir.1989) (en banc). A motion to dismiss an indictment will be denied if the dispute centers on factual questions, as such questions are within the province of the jury. *United States v. Kilpatrick*, 821 F.2d 1456, 1462 n. 2 (10th Cir.1987), *aff'd sub nom. Bank of Nova Scotia v. United States*, 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988).

### B. Discussion

### 1. Background

Defendants contend that counts one through eight should be dismissed because the program fraud statute does not reach the conduct alleged in the indictment.[2] The program fraud statute provides as follows:

---

1. The witness tampering charge and the money laundering charges were brought against Dr. Robert C. LaHue only.

2. The defendants' papers argue that dismissal of counts two through eight would compel dismiss-

al of the section 371 conspiracy charge in count one. At oral argument, however, the defendants conceded that the section 371 conspiracy charge does not necessarily depend on the viability of counts two through eight. See § 371 ("If two or more persons conspire *either* to commit any of-

(a) Whoever, if the circumstance described in subsection (b) of this section exists—

(1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—

(A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that—

(i) is valued at $5,000 or more, and

(i) is owned by, or is under the care, custody, or control of such organization, government, or agency; or,

(B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization ... involving anything of value of $5,000 or more ...

shall be fined under this title, imprisoned not more than 10 years, or both.

(b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal Program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

18 U.S.C. § 666.

Defendants argue that their ultimate receipt, in payment for medical services, of money whose origin is from Medicare Part B funds does not make them recipients of "benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance" as contemplated by the statute.[3] Specifically, defendants argue that Medicare *patients* are the true recipients of federal program funds—not Medicare providers. The excellent explanation of Medicare in *Garelick v. Sullivan*, 987. F.2d 913,

914–15 (2d Cir.1993) provides the proper framework for defendants' arguments:

Medicare is the federal medical insurance program for disabled persons and those 65 and older. *See* 42 U.S.C. § 1395, *et seq.* The Medicare program is composed of two parts, A and B. Part A provides insurance for the cost of hospitalization and related services, and is funded out of Social Security taxes. *See id.* at §§ 1395c–1395i–4. Part B, the exclusive focus of [the court here,] is a voluntary program that provides Medicare beneficiaries with supplemental benefits. *See id.* at §§ 1395j–1395w–4. Part B beneficiaries pay monthly premiums that, along with federal government contributions, are remitted to the Federal Supplementary Medical Insurance Trust Fund. *See id.* at § 1395t. The Department of Health and Human Services has responsibility for administering the program, and contracts with private insurance carriers who evaluate and pay Part B claims out of the Trust Fund. *See id.* at § 1395u.

If the carrier finds that a claim is reimbursable, Medicare pays 80% of the Medicare-defined allowed or "reasonable" charge for the claim. *See id.* at § 13951(a)(1); *see also* 42 C.F.R. § 405.501, *et seq.* The beneficiary is responsible for a "copayment" of the remaining 20% of the allowed charge.

Part B provides physicians with two payment options. They Can choose to "accept assignment," which means that they [get permission from their patients to] bill Medicare directly for their services and [agree to] accept the allowed charge as full payment, receiving 80% from Medicare and 20% from the beneficiary. *See* 42 U.S.C. § 1395u(b)(3)(B)(ii). Alternatively, a physician may choose to bill the patient directly for 100% of [his or her] charge, with Medicare reimbursing the patient for 80% of the Medicare reasonable charge. *See id.* at §§ 13951(a)(1), 1395u(b)(3)(B)(i).

---

fense against the United States *or to defraud the United States ...* ") (emphasis added). Accordingly, the court denies the defendants' motion to dismiss count one.

**3.** At the court's December 19, 1997 hearing, the government limited itself to the theory that section 666's $10,000 jurisdictional amount was met only through BVMG's receipt of payments for services rendered to patients, i.e., Medicare Part B funds.

A physician who does not accept assignment may charge [his or] her patient in excess of the Medicare allowed charge, a practice called "balance billing."

In recent years, Congress has enacted a series of statutes designed to discourage and limit balance billing and encourage physicians to accept assignment. The Deficit Reduction Act of 1984 ("DEFRA") created the "Participating Physicians Program," requiring physicians to decide on an annual basis whether to enter into "participation agreements." During the term of a participation agreement, a participating physician agrees to accept assignment for all items and services [he or] she provides under Part B and is precluded from balance billing. *See id.* at § 1395u(h)(1). Under DEFRA, a non-participating physician retained the option of accepting or refusing assignment in individual cases. However, DEFRA provided incentives for physicians to enter into participation agreements. For example, the statute temporarily froze the fees non-participating physicians could charge Medicare patients. *See id.* at § 1395u(j)(1)(A); *Pennsylvania Medical Soc'y v. Marconis*, 942 F.2d 842, 844 (3d Cir.1991).

The Omnibus Budget Reconciliation Act of 1986 ("OBRA–86") lifted the DEFRA freeze on non-participating physician fees, substituting a system of "maximum allowable actual charges" ("MAACs") for services. *See* 42 U.S.C. § 1395u(j)(1)(B)(i). MAACs were initially based upon physicians' actual charges for the quarter beginning on April 1, 1984. *See id.* at § 1395u(j)(1)(C)(iv) Under OBRA–86, non-participating physicians were not permitted to charge Part B beneficiaries in excess of MAAC rates, unless their annual average fees fell below levels set forth in the statute. *See* Omnibus Budget Reconciliation Act of 1986, Pub.L. No. 99–509, 100 Stat. 1874, 2018–22 (1986); H.R.Conf. Rep. No. 1012, 99th Cong., 2d Sess. 330–31, reprinted in 1986 U.S.C.C.A.N. 3868, 3975–76.

The Omnibus Budget Reconciliation Act of 1989 ("OBRA–89"), included provisions designed to further "protect [Medicare] beneficiaries against excessive balance billing" by non-participating physicians. H.R.Rep. No. 247, 101st Cong., 1st Sess. 348, reprinted in 1989 U.S.C.C.A.N.1906, 2074. OBRA–89 replaced the MAAC formula with a concept called the "limiting charge," which limits non-participating physicians' charges to set percentages of the Medicare-defined allowed charge for services. *See* 42 U.S.C. § 1395w–4(g)(2). The limiting charge is now 115% of the allowed charges for services. *See id.* at § 1395w–4(g)(2)(C).

It is clear from this background and from legislative statements in the Medicare statute itself that the target beneficiaries of the Medicare Part B program are individual patients. Congress enacted Medicare "to provide medical insurance benefits ... *for aged and disabled individuals.*" 42 U.S.C. § 1395j (emphasis added). Medicare's use of private insurance carriers is intended to "provide for the administration of the benefits under this part ... with maximum efficiency and convenience *for individuals entitled to benefits under this part* ... and for providers of services ... to such individuals...." 42 U.S.C. § 1395u(a) (emphasis added). Medicare was not established to benefit health care providers, nor did Congress place health care providers in charge of administering the program or the funds generated to implement the program.

## 2. Issue

Medicare's framework places the ultimate question in its proper perspective: do providers of services to Medicare Part B patients receive "benefits ... under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance" within the meaning of section 666(b)? Neither the Supreme Court, the Tenth Circuit, nor any other court has answered this question.

After exhaustively reviewing the relevant authorities, the court concludes that such providers do not fall within the meaning of section 666(b). The court concludes that section 666 jurisdiction does not reach beyond the intended target of the pertinent federal program benefit. Once a federal program benefit reaches its target recipient, it simply loses its character as a "benefit." The mon-

ey does not continue to retain its characterization as a federal benefit indefinitely. BVMG receives money with a federal origin only through payments or assignments from its Medicare patients—the target beneficiaries of the Medicare program who have, in fact, received federal benefits. The court therefore concludes that BVMG agents are not subject to section 666 prosecution.

### 3. Ambiguity of Section 666

The court begins, as it does when it construes any statute, with the plain language of section 666. *See Salinas v. United States,* —— U.S. ——, ——, 118 S.Ct. 469, 473, 139 L.Ed.2d 352 (1997). On the one hand, the notion that the defendants' alleged Medicare related bribery scheme falls within the plain language of the statute's jurisdictional clause has superficial appeal. *See United States v. Stewart,* 727 F.Supp. 1068, 1072 n. 5 (N.D.Tex.1989) (citing without analysis Medicare as an example of a program that falls within section 666's reach). Medicare, after all, is undoubtedly the kind of federal program Congress was thinking about when it enacted section 666, and BVMG was allegedly intimately involved with Medicare and Medicare patients. Moreover, BVMG annually received well over $10,000 that is directly traceable to Medicare Part B funds.

On the other hand, it would be improper to conclude that section 666 jurisdiction lies merely because the *bribes* the defendants allegedly received relate to the referral of Medicare patients.[4] The United States Supreme Court has held that section 666 applies even to bribes or thefts having absolutely no effect on the federal funds received. *Salinas v. United States,* —— U.S. ——, ——, 118 S.Ct. 469, 475, 139 L.Ed.2d 352 (1997). Section 666(b) jurisdiction must stand or fall, then, whether the alleged improper activity were a BVMG secretary's theft of a $5,000 laptop computer or the defendants' alleged acceptance of bribes for the referral of Medicare patients.

Upon removing the Medicare bribes from the jurisdictional calculus (which the court must, according to *Salinas,* do) there is much

less appeal to a quick-look conclusion that section 666 reaches BVMG agents. In the abstract, nearly every organization in one way or another receives "benefits" in excess of $10,000 under a federal program. Nearly every organization, for example, has agents that use highways constructed in part with federal monies. Although such organizations may remotely "receive ... benefits in excess of $10,000 under a Federal program involving a grant ... or other form of Federal assistance," such organizations surely do not fall within section 666's jurisdictional reach. Closer to the point, nearly every large grocery store chain directly receives more than $10,000 in food stamps as payment from customers. Although such chains would appear to "receive ... benefits in excess of $10,000 under a Federal program involving a grant ... or other form of Federal assistance," surely a checkout clerk's theft of $5,000 in cash from a cash register does not constitute *federal* program fraud.

The Court concludes, as a result, that the statute is ambiguous. *See Salinas,* —— U.S. at ——, 118 S.Ct. at 474. While the statute could plausibly be read to apply to Medicare Part B providers because the money such providers receive in exchange for the services they render could constitute "benefits ... under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance," the statute could just as plausibly be read to exclude Medicare Part B providers because the term "benefits" in the statute must have some finite limit. *See, e.g., United States v. Wyncoop,* 11 F.3d 119, 123 (9th Cir.1993) (holding that section 666 does not reach remote, indirect recipients of federal program benefits). The *patients* of Medicare providers are the target recipients of federal "benefits" and the *patients* stand between the government and the service providers. Medicare Part B providers ultimately receive funds traceable to a federal program, but they do so only through patient payments or assignments.

---

4. Congress, in fact, has subjected these very acts of bribery to criminal sanctions under a wholly unrelated statute. *See* 42 U.S.C. § 1320a–7b(b) (criminalizing the solicitation of acceptance of

bribes for Medicare patient referrals). For whatever good and sufficient reasons, the government did not choose to indict the defendants under this statute.

#### 4. Legislative History Analysis

Finding the statute ambiguous, the court proceeds to examine the statute's legislative history. *See United States v. Simmonds,* 111 F.3d 737, 742 (10th Cir.1997).

Section 666's legislative history reveals that although Congress intended the term *Federal program* to be construed broadly,[5] Congress did not aim section 666 at organizations that merely receive federal "benefits" after such benefits have reached their intended beneficiary. The Senate Committee on the Judiciary identified three cases which illustrate, the court believes, Congress' aim in drafting section 666. S.Rep. No. 225 at 370, 98th Cong., 2d Sess., reprinted in 1984 U.S.C.C.A.N. 3182, 3511 ("It is ... the intent to reach thefts and bribery in situations of the types involved in the *Del Toro, Hinton,* and *Mosley* cases...."); *see also Salinas v. United States,* —— U.S. ——, ——, 118 S.Ct. 469, 475, 139 L.Ed.2d 352 (1997) ("Congress enacted § 666[to] ma[ke] it clear that federal law applies to bribes of the kind offered to the state and local officials in [all three cases.]"). Each of these three cases involved an organization with responsibility for administering or spending federal grant monies to benefit the intended targets of a federal assistance program. Each of these three cases involved an organization receiving federal benefits before such benefits had reached the intended targets of the pertinent federal program.

In *United States v. Del Toro,* 513 F.2d 656, 661 (2d Cir.1975), the organization at issue was the Harlem–East Harlem Model Cities Program. The court there held that the then-existing bribery statute did not reach bribes to the assistant administrator of the Model Cities Program even though "the United States government had determined to implement certain of its social and government objectives by financing ... Model Cities," and even though the federal government financed Model Cities "by paying 100% of the Cost of its program and 80% its salaries." *Id.* at 661–62. The federal government's objective in participating in Model Cities apparently was to revitalize inner city areas like Harlem. *Id.*

In *United States v. Hinton,* 683 F.2d 195, 196 (7th Cir.1982), *aff'd sub nom. Dixson v. United States,* 465 U.S. 482, 104 S.Ct. 1172, 79 L.Ed.2d 458 (1984), the organization at issue was a non-profit corporation called United Neighborhoods, Inc. ("UNI"). The court there held that the then-existing bribery statute was sufficient to reach the solicitation of bribes by agents of UNI where UNI had entered into a contract with the city of Peoria, Illinois to administer federal funds under a Community Development Block Grant from HUD. *Id.* The purpose of the grant was "community development, including the rehabilitation of house structures." *Id.* The program UNI administered "was entirely sponsored by federal funds, which paid UNI's costs as well as the salaries of its employees." *Id.*

In *United States v. Mosley,* 659 F.2d 812, 813 (7th Cir.1981), the State of Illinois Bureau of Employment Security ("IBES") was the organization at issue. The court there held that the then-existing bribery statute was sufficient to reach the solicitation of bribes by an IBES employee employed pursuant the Comprehensive Employment and Training Programs Act ("CETA"). *Id.* CETA was intended "to put under one umbrella the many varied [federal] manpower employment and training programs antedating [CETA]." *Id.* at 815. "The cost of the jobs as well as all of IBES' costs, including [the defendant's] salary, was paid for entirely by the Federal Government ...." *Id.* at 813.

BVMG's "receipt" of federal benefits falls outside the aim of section 666 because, unlike the organizations at issue in *Del Toro, Hinton,* and *Mosley,* BVMG received its allegedly federal "benefits" after they had reached their intended recipient. The purpose of section 666, Congress said, was "to protect the integrity of the vast sums of money distributed through Federal programs...." S.Rep. No. 225 at 370, 98th Cong., 2d Sess., reprinted in 1984 U.S.C.C.A.N. 3182, 3511. BVMG is an organization that receives monies paid or assigned to it by its patients—the intended targets of a federal assistance program.

---

**5.** *See* S.Rep. No. 225 at 370, 98th Cong., 2d Sess., reprinted in 1984 U.S.C.C.A.N. 3182, 3511. Medicare is undoubtedly a "Federal pro- . gram" which section 666 would reach in a proper case.

Once a patient receives his or her benefit (in the form of a check or in the form of a payment on his or her behalf), the "vast sums of money" about which Congress was concerned would appear to be completely "distributed" without any further need to protect their "integrity."

There can be no doubt that the defendants' alleged solicitation and acceptance of bribes for Medicare patient referrals injure the integrity of Medicare.[6] As *Salinas* indicates, however, the nature of these alleged bribes is largely irrelevant for jurisdictional purposes. BVMG simply did not receive more than $10,000 of Medicare benefits in such a way as to trigger Congress' expressly articulated interest in protecting the integrity of Federal program monies.

### 5. Caselaw Analysis

*United States v. Zyskind,* 118 F.3d 113 (2d Cir.1997), is consistent with the court's reading of section 666(b). The Second Circuit in *Zyskind* affirmed the conviction of the administrator of Hi–Li Manor Home for Adults ("Hi–Li"), reasoning that section 666's reach extended to organizations like Hi–Li. *Id.* at 117. Hi–Li was not a direct recipient of federal program funds. *Id.* at 114. Hi–Li acted, however, as a legal custodian for many of its residents. *Id.* As legal custodian, Hi–Li received federal benefits on behalf of its wards. *Id.* Hi–Li also received monies traceable to a federal program as an endorsee of checks made payable solely to various residents over whom its was not a legal custodian. *Id.* Beryl Zyskind, Hi–Li's administrator, embezzled some of the benefits, and a jury found him guilty of program fraud. *Id.* Zyskind appealed, arguing that Hi–Li's receipt of its residents' benefits did not make Hi–Li a recipient of more than $10,000 under a federal program. *Id.* at 115. The Second Circuit, recognizing the legislative intent to protect the integrity of the vast sums of money distributed through Federal pro-

grams, . . . conclude[d] that § 666 was designed broadly to prevent diversions of federal funds not only by agents of organizations that are direct beneficiaries of federal benefits funds, but by agents of organizations to whom such funds are 'disbursed' [from the federal government] for further 'distribution' to or for the benefit of individual beneficiaries.

*Id.* at 116. The Second Circuit discredited Zyskind's contention that its jurisdictional holding was too expansive by recognizing that the District Court in *Zyskind* allowed the jury to consider "only those government benefits checks that were made payable solely to Hi–Li, not those that were made payable solely to the individual beneficiary and later endorsed to Hi–Li." *Id.* at 117.

The *Zyskind* decision supports the court's finding that section 666 jurisdiction does not reach beyond the intended beneficiary of the pertinent federal program benefit. Section 666 jurisdiction was proper as to the benefits checks Hi–Li received as a fiduciary because such checks had not yet reached the targets of the pertinent federal programs.[7] Section 666 jurisdiction likely would have been improper as to the benefits checks Hi–Li received as an endorsee because such checks had already reached the targets of the pertinent federal programs.[8]

*United States v. Wyncoop,* 11 F.3d 119 (9th Cir.1993), is also consistent with the court's reading of section 666. The *Wyncoop* court held that section 666 did not reach the conduct of an accounting employee at Trend College, a private institution, because the college did not receive federal program benefits as contemplated in section 666(b). *Id.* at 123. The government had argued that Trend College received federal program funds through the Guaranteed Student Loan ("GSL") and Supplemental Loans to Students ("SLS") programs. *Id.* at 121. The

---

6. *See supra* part II.B.3; 42 U.S.C. § 1320a–7b(b).

7. It could also be argued that Hi–Li *itself* was the target recipient of these benefits because it legally stood in the shoes of its wards. In any event, however, jurisdiction over Hi–Li is consistent with this court's reading of section 666 because jurisdiction did not reach beyond the target recipient of the federal benefit.

8. The Court does not believe there is a material distinction between the endorsement of benefits checks and the assignment of Medicare payments. Endorsed checks and assigned benefits both represent a right to receive payment from the federal government. The individual endorser or assignor is an indispensable intermediary in such transactions.

**1190**

Ninth Circuit rejected the government's theory, however, because the loan programs provided Trend "with only the indirect benefits associated with increased enrollment of students receiving private loans induced by federal guarantees to private lenders." *Id.* at 122. "The direct financial beneficiaries of the guarantee programs (were) the students who receive the loans and the banks whose loans are federally guaranteed." *Id.*

Although this Court is hesitant about the validity of *Wyncoop's* direct/indirect beneficiary rationale,[9] the ultimate holding in *Wyncoop* supports cutting off section 666 jurisdiction before it reaches beyond the target recipient of the pertinent federal program. Trend College enjoyed the fruits of the GSL and SLS programs only after its students, the target beneficiaries of the GSL and SLS programs, had received the loans that Congress designed these programs to induce. Accordingly, Trend College's agents were not subject to prosecution under section 666.

### 6. Government Arguments

The government's arguments against dismissing counts two through eight do not persuade the court to deny the defendants' motion because the cases the government cites are either consistent with the court's reading of section 666 or are inapposite. The government's primary arguments center around *Salinas v. United States*, —— U.S. ——, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997). The government contends that (1) *Salinas* supports a broad reading of section 666, and (2) the implicit finding that federal jurisdiction was proper in *Salinas* compels a similar finding in this case. The court addresses each of these contentions in turn.

*Salinas* does not support a reading of section 666 that is broad enough to encompass these defendants. The issue in *Salinas* was whether section 666(a)(1)(B) bribes must somehow affect federal funds in order for section 666 to apply. *Id.* 118 S.Ct. at 473. Holding that bribes do not need to affect federal funds, the Supreme Court observed that section 666's "expansive, unqualified language, both as to the bribes forbidden and

the entities covered, does not support the interpretation that federal funds must be affected to violate § 666(a)(1)(B)." *Id.* In observing section 666's "expansive, unqualified language ... as to ... the entities covered," the Supreme Court was noting only that section 666(b) "provides no textual basis for limiting the reach of the bribery prohibition." *Id.* The Supreme Court most certainly was not implying that section 666(b)'s jurisdictional clause should be read any more broadly than its language and purpose permit.

Moreover, the implicit finding of jurisdiction in *Salinas* does not compel a finding of jurisdiction in this case. The finding is consistent with the court's conclusion that section 666 jurisdiction does not reach beyond the target recipient of the pertinent federal program. Although the Supreme Court "denied certiorari on the question whether the monies paid to the county were 'benefits' under a 'Federal program' under § 666(b)," *id.* 118 S.Ct. at 472, the Fifth Circuit opinion which *Salinas* affirmed reveals that section 666(b) jurisdiction was proper in *Salinas* even though it is improper here. *See United States v. Marmolejo*, 89 F.3d 1185 (5th Cir. 1996), *aff'd sub nom. Salinas*, 118 S.Ct. at 478. The alleged recipient of benefits in *Salinas* was a local government—Hidalgo County, Texas. *Marmolejo*, 89 F.3d at 1188. The Fifth Circuit held that the Hidalgo County Jail was a recipient of over $10,000 in federal program benefits. *Id.* at 1190–91. The county had agreed to accept

> Federal participation in the funding of local governmental jail construction, renovation or improvement programs ... predicated upon the Federal government's requirement for detention space and services and the local government's provision of such services." *Id.* at 1189. As a condition to the receipt of this grant, Hidalgo County Jail had to guarantee that it would provide detention space for federal prisoners.

*Id.* at 1190. A subsequent agreement established the specific provisions and require-

---

**9.** *See United States v. Dransfield*, 913 F.Supp. 702, 710 (E.D.N.Y.1996) ("The legislative history indicates that it is the receipt of federal funds, rather than the direct receipt of such funds from their original source, that is relevant for purposes of § 666.").

ments pertaining to the detention of federal prisoners and the federal government's payment therefor. *Id.* Although the federal benefits with which the County constructed and improved its jail facilities inured well before the time period for measuring the receipt of federal benefits, *see* § 666(b) (agency must receive more than $10,000 of federal program benefits in "any one year period"), the Fifth Circuit held that the construction benefits and the corresponding duty to detain prisoners on behalf of the federal government collectively constituted one interrelated federal program. *Id.* The periodic payments Hidalgo County Jail received in exchange for detaining federal prisoners provided the requisite $10,000 in federal program benefits in "any one year period" because the payments were so inextricably interrelated with the funds directly used to improve the jail facilities. *Id.* at 1191.

*Marmolejo* jurisdiction is consistent with the court's reading of section 666 because the Hidalgo County Jail was the intended target of the integrated federal program at issue. *Marmolejo* jurisdiction does not compel jurisdiction over BVMG's agents because BVMG's receipt of funds whose origin was from federal program benefits is nothing like Hidalgo County Jail's receipt of federal program benefits: Hidalgo County Jail was the target recipient of federal program funds intended in part to provide for "federal participation in the funding of local governmental jail construction, renovation or improvement programs." *Id.* at 1190. BVMG received money traceable to federal program "benefits" only after the benefits had reached their target.

At oral argument, the government placed heavy reliance on *United States v. Nichols,* 40 F.3d 999 (9th Cir.1994), but the court believes *Nichols* is inapposite. In that case, the Los Angeles County Sheriff's Department ("LASD") received federal forfeited narcotics assets after it cooperated in federal drug investigations. *Id.* at 1000. The defendant, an LASD deputy, argued that his section 666 conviction was invalid because section 666(c) excludes organizations who receive a quid pro quo from the federal government. *Id.* The defendant believed that the forfeited assets were given to LASD because it cooperated in federal law enforce-

ment activity. *Id. Nichols,* thus, is nothing like the case here. The Court does not conclude that BVMG agents are not reachable in a section 666 prosecution because BVMG engaged in a money-for-medical services quid pro quo with the federal government. Instead, the Court concludes that BVMG agents are not reachable in a section 666 prosecution because BVMG simply did not receive more than $10,000 in federal program benefits. BVMG merely engaged in a money-for-medical services transaction with its patients, who paid BVMG in funds provided for the patients' benefit by the federal Medicare program. BVMG, unlike the LASD, received these funds after they had reached the intended target of the pertinent program.

The government also relies on *United States v. Dransfield,* 913 F.Supp. 702, 712 (E.D.N.Y.1996), which held that the New York City School Construction Authority ("SCA") was an organization that received more than $10,000 of federal program benefits. The court believes *Dransfield* is unhelpful to the government, however, because the SCA in *Dransfield* received federal program benefits before the intended beneficiary of the federal program at issue. The SCA in *Dransfield,* in fact, is much more akin to the organizations at issue in *Del Toro, Hinton,* and *Mosley* —organizations Congress expressly intended to reach—than it is akin to BVMG. Like the organizations at issue in *Del Toro, Hinton,* and *Mosley,* the SCA was an organization with responsibility for administering or spending federal grant monies to benefit the intended targets of a federal assistance program. *Id.* 913 F.Supp. at 708. Even though the SCA was not a direct recipient of funds from the federal government—it indirectly received funds directly allocated to the Port Authority of New York & New Jersey—the SCA agreed to procure, using federal program funds, the services of consultants to design noise abatement construction projects. *Id.* The target beneficiaries of the federal program at issue apparently were the public schools adjacent to J.F.K. and LaGuardia Airports. *Id.* These schools had not yet received the benefits Congress intended them to receive when the *Dransfield* defendant engaged in bribery activity.

Accordingly, *Dransfield* is entirely Consistent with the court's reading of section 666 jurisdiction and does not persuade the court that jurisdiction is proper here.

The government also argues counts two through eight should not be dismissed because Medicare providers in apparently similar circumstances have been convicted under section 666 in the past. *See United States v. Henry,* Nos. 92–6649, 92–6650, and 92–6653, 1993 WL 492302 (6th Cir. Nov.29, 1993); *United States v. Fernandez,* 905 F.2d 350 (11th Cir.1990); *United States v. Stout,* Nos. CIV.A. 93–2289, CR. 89–317, 1994 WL 90025 (E.D.Pa. March 21, 1994), aff'd, 39 F.3d 1173 (3rd Cir.1994); *United States v. Sadlier,* 649 F.Supp. 1560 (D.Mass.1986). *Henry* is inapplicable to the case here because the organization at issue in *Henry* was a Home Health Agency, see 42 U.S.C. § 1395x(*o*), and apparently received federal benefits in a way different from BVMG's "receipt" of Medicare Part B funds. *Henry,* 1993 WL 492302, at *1. Moreover, the Henry court performed only a perfunctory analysis of section 666 jurisdiction. *Id.* 1993 WL 492302 at *6. *Stout* is more on-point than the other Medicare Cases, but it, too, is unpersuasive. The argument in Stout was nearly identical to the argument in *United States v. Nichols,* 40 F.3d 999 (9th Cir.1994) (quid pro quo argument), which this court has already decided is inapposite. *See Stout,* 1994 WL 90025, at *1–*3. The *Stout* Court was not faced with an argument that the hospital there did not receive $10,000 in federal program benefits. *Fernandez* and *Sadlier* are unpersuasive because they did not analyze section 666 jurisdiction at all.

### C. Conclusion

The parties excellent and comprehensive briefing and the court's exhaustive research Convince the court that Congress did not intend section 666 jurisdiction to be infinite. In the abstract, almost every organization in one way or another receives remote benefits (like the use of federally funded highways) in excess of $10,000 under a federal program. The court cannot conceive that Congress intended such organizations to fall within section 666's reach, nor does it believe that Congress intended grocery store Chains that accept food stamps to fall within section 666's reach. Although no court has decided precisely when section 666 jurisdiction lies and when it does not, the most logical result, and the only result consistent with the entire body of federal caselaw, is to conclude that there is no jurisdiction under section 666 when the target recipient of the pertinent federal benefit has received the funds Congress intended him or her to receive. Such a result excludes the hypothetical highway user and the hypothetical grocery store chain from the statute's reach. It also excludes BVMG. The result allows the statute to reach, however, organizations of the type described in *Salinas, Zyskind, Dransfield, Nichols, Del Toro, Hinton,* and *Mosley* — organizations of the type Congress expressly intended to reach.

Because BVMG falls outside section 666's jurisdictional reach, the defendants' motion to dismiss counts two through eight is hereby granted.

### III. Severance Motions

The defendants jointly move to sever counts one through eight from counts nine and ten. Defendant Robert C. LaHue moves to sever count ten from the other counts. Having dismissed counts two through eight, the court construes the defendants' motions as motions to sever the remaining counts (counts one, nine, and ten).

The defendants contend that three separate trials should be had because Counts one and nine were improperly joined under Fed.R.Crim.P. 8. In the alternative, they believe three separate trials should be had because a single trial would prejudice them pursuant to Fed.R.Crim.P. 14 ("Relief from Prejudicial Joinder"). Rule 8(a) allows for the joinder of two of more offenses if the offenses "are based ... on two or more ... transactions connected together or Constituting parts of a Common scheme or plan." Fed.R.Crim.P. 8(a). In analyzing a joinder question, the court must weigh the benefits to the public of a single trial against the possibility of prejudice to the defendants. *United States v. Bailey,* 952 F.2d 363, 365 (10th Cir.1991).

■ Joinder of counts one and nine is proper in this case because the two counts constitute parts of a common scheme or plan. The alleged conspiracy to submit false Medicare claims (count nine) apparently allowed the defendants to increase BVMG's patient census to the point that BVMG had sufficient market share to demand the bribes that are a subject of the count one conspiracy to defraud the federal government. Moreover, the defendants have failed to show how a single trial would prejudice them.[10] Accordingly, the defendants' joint motion to sever count one from count nine is denied.

Joinder of count ten with counts one and nine is also proper in this case because the witness tampering alleged in count ten is "connected together" with counts one and nine. Count ten alleges that Dr. Robert LaHue advised a former BVMG employee to "keep her mouth shut" about BVMG's business practices. Moreover, neither Dr. Robert LaHue nor Dr. Ronald LaHue has shown how he would be prejudiced by a single trial. Dr. Robert LaHue's statement may be admissible against both defendants at the trial of counts one and nine regardless of whether count ten is severed. *See* Fed.R.Evid. 801(d)(2)(A) (party admission); Fed.R.Evid. 801(d)(2)(E) (coconspirator statements); *see also United States v. Williamson*, 53 F.3d 1500, 1520 (10th Cir.1995) (statements aimed at avoiding detection are in furtherance of conspiracy).[11]

**IT IS THEREFORE ORDERED BY THE COURT** that defendants' motion to dismiss Counts one through eight (Doc. 80) is granted in part and denied in part. The motion is denied as to count one. The motion is granted as to counts two through eight, and those counts are hereby dismissed.

**IT IS FURTHER ORDERED** that the motions to sever (Docs.78, 79) are denied.

**IT IS SO ORDERED.**

### *MEMORANDUM AND ORDER*

Defendant physicians were indicted on charges of program fraud and other crimes in connection with their operation of an al-

leged Medicare mill. On March 18, 1998, the court dismissed the program fraud charges at the defendants' request because it found as a matter of law that the defendants were not agents of an organization that received more than $10,000 in benefits under a federal program. *See* 18 U.S.C. § 666(b); *United States v. LaHue*, 998 F.Supp. at 1192–93 (D.Kan.1998). The matter is now before the court on the government's motion to reconsider the order dismissing the program fraud counts (Doc. 108). For the reasons set forth below, the government's motion is denied.

### I. Indictment

The indictment alleges that between 1984 and early 1995, the doctors, who are brothers, controlled Blue Valley Medical Group ("BVMG"). BVMG was a group of physicians that provided medical services to patients in nursing homes. Most, if not all, of these patients used funds derived from the federal Medicare program to pay for BVMG services. Dr. Robert LaHue was the president and Dr. Ronald LaHue was vice-president of BVMG.

The indictment alleges in counts one through eight that the defendants entered into a number of different sham "consulting agreements" with various hospitals. Under the agreements, the defendants received annual consulting "fees" from each hospital in amounts ranging from $50,000 to $150,000. The consulting agreements allegedly falsely gave the impression that hospitals paid the doctors for performing certain specified consulting duties. The true purpose of the agreements, the indictment alleges, was to bribe BVMG to refer patients to the hospitals. The defendants allegedly did not render services under the agreements, nor did they intend to. The payments defendants solicited and received under the agreements allegedly do not represent the fair market value for any of the "consulting" services they rendered.

---

10. Having failed to show prejudice, the defendants' argument that Rule 14 requires severance of count one from count nine has no merit.

11. Having failed to show prejudice, Dr. Robert LaHue's argument that Rule 14 requires severance of count ten has no merit.

## II. Discussion

### A. Motion to Reconsider Standard

 Because there is no provision for a motion to reconsider in the Federal Rules of Criminal Procedure, federal courts recognize motions to reconsider pursuant to the common law doctrine recognized in *United States v. Healy*, 376 U.S. 75, 84 S.Ct. 553, 11 L.Ed.2d 527 (1964). *See also United States v. Dieter*, 429 U.S. 6, 8 n. 3, 97 S.Ct. 18, 50 L.Ed.2d 8 (1976) ("The Court of Appeals' concern with the lack of a statute or rule expressly authorizing treatment of a post-dismissal motion ... ignores our having grounded our decision in *Healy*, not on any express authorization ... but rather on 'traditional and virtually unquestioned practice.'") (quoting *Healy*, 376 U.S. at 79); *United States v. Corey*, 999 F.2d 493, 495 (10th Cir.1993). Such motions are essentially treated the same as motions to alter or amend judgment in the civil context under Fed.R.Civ.P. 59(e). *United States v. Schweibinz*, No. 93–40001–06–SAC, 1994 WL 129998, at *1 n. 1 (D.Kan. March 15, 1994). The motions allow a party to allege fundamental legal errors that require the court to reconsider an earlier decision. *Federated Mut. Ins. Co. v. Botkin Grain Co.*, 856 F.Supp. 607, 609 (D.Kan.1994). They should be granted only "to correct manifest errors of law or to present newly discovered evidence." *Phelps v. Hamilton*, 122 F.3d 1309, 1324 (10th Cir.1997). The opportunity to present a motion to reconsider should not be viewed as a second opportunity "for the losing party to make its strongest case or to dress up arguments that previously failed." *Schweibinz*, 1994 WL 129998, at *1 n. 1. Whether to grant or deny a motion to reconsider is committed to the district court's sound discretion. *Phelps*, 122 F.3d at 1324.

### B. Analysis

In its prior memorandum and order, the court recognized that 18 U.S.C. § 666, the program fraud statute, applies only to agents of an organization that "receives ... benefits in excess of $10,000 under a Federal program ...." § 666(b). The government at that stage of these proceedings insisted that BVMG received benefits in excess of $10,000 under the Medicare program because BVMG received money in payment for medical services whose origin was from Medicare Part B funds. The court engaged in a comprehensive review of the governing law and determined that the money BVMG received was no longer a "benefit ... under a Federal program" at the time BVMG received it because the money had already reached the beneficiaries Congress intended it to reach—Medicare patients.

 The government's basic argument remains that because BVMG received more than $10,000 the source of which was from the Medicare program, BVMG received "benefit[s] ... under a Federal program" sufficient to confer section 666 jurisdiction. The government now attempts to bolster its argument by asking the court to consider new legal and factual arguments. First, the government points to BVMG's association with Johnson County Medical Laboratory ("JCML"). The government notes that JCML provides "clinical diagnostic tests," but unlike BVMG, JCML receives payment directly from Medicare regardless of whether its patients assign their benefits. *See* 42 U.S.C. § 13951(h)(5)(A) ("payment may be made only to the person or entity which performed or supervised the performance of such test"). Second, the government points to Medicare's complex administrative scheme that allows doctors to contest Medicare payments and assert their patients' rights when doing so. *See, e.g.,* 42 C.F.R. § 405.801 (supplier stands in shoes of beneficiary); 42 C.F.R. §§ 405.807, 405.815, 405.821 (carrier review, fair hearing); 42 U.S.C. § 1393ff (ALJ hearing); 20 C.F.R. §§ 404.929–404.961 (ALJ hearing). The government contends that this scheme supports its theory that Congress viewed organizations like BVMG as recipients of benefits from Medicare. Finally, the government points out that Medicare suppliers like BVMG are heavily regulated. The level of regulation, contends the government, indicates that Congress was concerned about Medicare suppliers' receipt of funds derived from the Medicare program.

The court will not consider the government's newly raised arguments because they are nothing more than an attempt to take a second bite at the apple by presenting what the government may consider its strongest case. *See Schweibinz*, 1994 WL 129998, at *1 n. 1. The government had the opportunity

to make these points when the court considered the motion to dismiss, but the government chose not to do so. The government's arguments do not demonstrate a manifest error of law, *see Phelps*, 122 F.3d at 1324, nor do they reflect newly discovered evidence. *See id.* As courts have consistently recognized, it would be fundamentally unfair to permit a party simply to add to or embellish upon arguments through the vehicle of a motion to reconsider.

Were the court to reach the merits of the government's newly presented arguments, it is far from clear how they would affect the outcome. Although the indictment indicates in paragraph 9 that JCML was owned and operated by one of the defendants, "Robert C. LaHue, d/b/a Robert. C. LaHue, D.O., Chartered, d/b/a Blue Valley Medical Group," the indictment does not make any specific allegation that Dr. Ronald H. LaHue had any affiliation with JCML, or that BVMG was a "d/b/a" of JCML, or that either of the defendants were agents of JCML. Thus it is difficult to see what impact JCML's receipt of Medicare funds might have under the indictment here in light of the prerequisite that the defendant be "an agent of an organization" that receives the necessary benefits. *See* § 666(a)(1). Moreover, the indictment does not allege any connection between the bribes the defendants allegedly solicited and the business of JCML. Section 666 requires that bribe-soliciting defendants, as agents of an organization, "intend[ ] to be influenced in connection with any business, transaction, or series of transactions of such organization." § 666(a)(1)(B). Frankly, the entire argument about JCML appears to be an afterthought, not one on which the government premised jurisdiction in framing the indictment.[1]

Even if the indictment were wholly consistent with the government's argument, it is far from clear whether agents of organizations like JCML would fall within the statute. The relationship between JCML and the federal government is much too dissimilar from the relationships Congress expressly intended section 666 to reach for the court readily to conclude that JCML agents would fall within the statute's jurisdiction. The thrust of the court's prior holding, that "section 666 jurisdiction does not reach beyond the intended target of the pertinent federal program benefit," *LaHue*, 998 F.Supp. at 1186–87, simply does not address whether the statute reaches organizations like JCML. What is clear, in any event, is that JCML patently is not an intended beneficiary of the Medicare program. *See* 42 U.S.C. § 1395gg(a) ("Any payment under [Medicare] to any provider of services or other person with respect to any items or services furnished any individual shall be regarded as a payment to such individual."); 42 U.S.C. § 1395j (Congress enacted Medicare Part B 'to provide medical insurance benefits ... for aged and disabled individuals.' "); 42 U.S.C. § 1395u(a) (recognizing distinction between "individuals entitled to benefits" and "providers of services ... to such individuals"); 42 C.F.R. § 400.202 (*"Beneficiary* means a person who is entitled to Medicare benefits.") (emphasis added). The payments JCML receives are explicitly "on the [patient's] behalf," 42 C.F.R. § 410.150(b)(5), and the payments JCML receives are for services already furnished.

Nonetheless, the court leaves unresolved the question of whether the government's attempt to premise jurisdiction on JCML would have affected the outcome of the motion to dismiss if the indictment had properly premised jurisdiction on the defendant's association with JCML. The procedural posture of this case and the patent defects in the

---

1. Under no fair construction of the indictment can the court conclude that the government's allegations put the defendants on notice that their association with JCML was to provide the jurisdictional basis for the government's case. *See Russell v. United States*, 369 U.S. 749, 763–64, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962) (indictment should "sufficiently apprise the defendant of what he must be prepared to meet."); cf. Charles Alan Wright, *Federal Practice and Procedure: Criminal 2d*, § 125, at 367 (1982) ("neces-

sary allegations cannot be left to inference, but the pleading is sufficient, even if an essential averment is faulty in form, if by fair construction it may be found within the text."). The only fair reading of the indictment is that the defendant's association with BVMG was to provide the jurisdictional basis for the government's case and that the defendant's association with JCML was not to provide the jurisdictional basis for the government's case.

indictment's JCML-related allegations compel the court's restraint. The court believes that it simply was untimely for the government to raise these arguments for the first time on a motion to reconsider and improper for the government to raise the specter of JCML without having adequately pled its contentions in the indictment. The issue may more squarely present at some other time. Accordingly, the court feels it need not and should not decide the issue here.

With regard to the arguments based on Medicare's comprehensive administrative mechanisms and complex regulatory scheme, the court is even less convinced that further consideration of these matters would aid the government's cause. There is no question that Medicare establishes an administrative mechanism to resolve disputes nor is there a question that Medicare providers and suppliers are subject to heavy regulation. In fact, Congress explicitly criminalized the bribes of which the defendants are now accused in a statute which, unlike section 666, does not exempt individual health care suppliers who engage in the kind of wholesale bribery solicitations the government claims these defendants committed. *See* 42 U.S.C. § 1320a–7b(b). That Congress can and does regulate Medicare providers and suppliers, however, does not mean Congress intended to subject agents of organizational providers and suppliers to criminal liability for program fraud, causing a BVMG secretary's theft of a $5,000 laptop computer to constitute federal program fraud, *see LaHue*, 998 F.Supp. at 1186–87, while refusing to subject individual health care suppliers to the same criminal liability.[2] Nothing in the administrative or regulatory scheme surrounding Medicare suggests that Congress intended such a result.

**IT IS THEREFORE ORDERED BY THE COURT** that the government's motion to reconsider (Doc. 108) is denied.

**IT IS SO ORDERED.**

---

**2.** Individual suppliers, of course, must work within the same administrative mechanisms and regulatory scheme as organizational providers and suppliers yet they are not, by definition, subject to section 666.