[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
03/04/99
THOMAS  K. KAHN
CLERK

_____

Nos. 96-3587, 97-2877, and 98-2091

_____

D. C. Docket No. 95-239-CR-ORL-22

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JEFFREY ALLAN FISCHER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(March 4, 1999)**

Before ANDERSON and HULL, Circuit Judges, and HANCOCK[*], Senior District Judge.

HULL, Circuit Judge:

A jury convicted appellant Jeffrey Allan Fischer on thirteen counts, including violations

of 18 U.S.C. §§ 371 (conspiracy), 666 (fraud and bribery involving an organization receiving

_____

[*] Honorable James H. Hancock, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

federal funds), 1341 (mail fraud), 1343 (wire fraud), and 1957 (money laundering).[1]  Fischer

appeals his convictions and sixty-five-month sentence.

Fischer contends, inter alia, that his convictions on two counts under § 666 and on a

related conspiracy count should be reversed because the Government did not prove the statutory

prerequisite that the agency affected by Fischer's wrongdoing "receives, in any one year period,

benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan,

guarantee, insurance, or other form of Federal assistance."  18 U.S.C. § 666(b).[2]  After review,

we affirm Fischer's convictions and sentence.

## I. BACKGROUND

### A.  $1.2 Million Loan

At trial, the evidence established that in 1993 Fischer, as president and part-owner of

QMC, arranged for West Volusia Hospital Authority ("WVHA") to loan $1.2 million to QMC.

Fischer negotiated this loan with  WVHA's chief financial officer, Robert Caddick.  On June 30,

1993, Fischer and Caddick executed the loan agreements between QMC and WVHA.

---

[1] The jury convicted Fischer of one count of fraud involving an organization receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(A) (Count I); one count of giving a kickback to an agent of an organization receiving federal funds, in violation of 18 U.S.C. § 666(a)(2) (Count II); one count of mail fraud, in violation of 18 U.S.C. § 1341 (Count III); two counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts IV-V); one count of conspiracy to commit fraud involving an organization receiving federal funds, to give and accept a kickback involving an organization receiving federal funds, and to commit wire fraud, in violation of 18 U.S.C. § 371 (Count VI); and seven counts of money laundering, in violation of 18 U.S.C. § 1957 (Counts VII-XIII).

[2] Fischer also challenges (1) the sufficiency of the evidence regarding his intent to defraud and to bribe, (2) the particularity of the indictment, (3) the admission of evidence relating to his prior fraud convictions, (4) certain statements by the prosecutor during opening statement and closing argument, (5) the district court's decision not to hold an evidentiary hearing in reference to a Brady violation alleged in Fischer's motions for a new trial, and (6) the district court's finding that Fischer had the ability to pay restitution.  After careful consideration of each of these claims, we affirm the judgment of the district court.  See 11th Cir. R. 36-1.

2

As security for the $1.2 million loan, Fischer pledged QMC's accounts receivable and a $1 million letter of credit QMC had obtained for this purpose through a foreign bank, First Asia Development Bank ("FADB"). However, QMC's accounts receivable already were pledged to another QMC creditor. In addition, the $1 million letter of credit did not appear to be legitimate, and even if it were, its terms severely limited WVHA's ability to collect the $1 million.[3]

Furthermore, questions were raised about WVHA's authority to loan money to QMC. The questions arose both before WVHA loaned the $1.2 million to QMC, and later, when WVHA's board of directors discovered the loan had been made. WVHA, a local government agency funded by a bond issue, was authorized to invest its excess funds in only instruments backed by the federal government.[4]

Nonetheless, WVHA made the $1.2 million loan to QMC on July 2, 1993. QMC used the $1.2 million to repay creditors and to raise the salaries of QMC's five owner-employees, including Fischer. In addition, Fischer had QMC lend at least $100,000 to a company owned by the FADB representative who had assisted QMC with the $1 million letter of credit. Fischer also had QMC open options-

---

[3] After reviewing the $1 million letter of credit, the account representative at WVHA's bank expressed concerns to Caddick and to Fischer about the legitimacy of the letter of credit and about WVHA's ability to collect on the letter of credit, if necessary. The account representative's concerns were based on the facts that she had never heard of FADB and that the letter of credit had not been signed, would expire even before the WVHA-QMC loan matured, and required QMC's approval before WVHA could collect on it.

[4] As a result of a proposal presented by Caddick in April 1993, WVHA's finance committee did expand Caddick's investment authority. At trial, however, evidence indicated that investment in loans to private entities, such as QMC, still would not have been authorized.

trading accounts using these loan proceeds. In a short time, Fischer lost about $400,000 of the loan proceeds through his options-trading on QMC's behalf.[5]

In February 1994, WVHA's auditors disclosed the $1.2 million loan to QMC in the annual audit report. Through this report, WVHA's board of directors and the chairman of WVHA's finance committee first learned about the $1.2 million loan. Shortly thereafter the board asked that the loan be called. The due date for the loan was July 1, 1994.

On July 1, 1994, QMC did not have the funds to repay the loan. Later that month, Fischer persuaded FADB to send QMC a $1.2 million draft to repay WVHA. QMC endorsed this draft and presented it to WVHA, which in turn presented the draft to its bank. However, FADB refused to honor the draft when presented by WHVA's bank. Thus, WVHA was unable to collect the $1.2 million owed by QMC.

## B. $10,000 Kickback to Caddick

The evidence indicated that, in June 1993, Caddick requested a $10,000 loan from QMC at the end of one of Fischer and Caddick's initial meetings about the possibility of the $1.2 million loan. After QMC received the $1.2 million loan

---

[5] To show that Fischer had a pattern of fraudulently obtaining money and then using that money to speculate in the securities market, the Government introduced evidence that Fischer, while a broker for E.F. Hutton, had embezzled two million dollars of his clients' money. Fischer thereafter lost the two million dollars in failed investments. As a result of these actions, Fischer was convicted on three counts of mail fraud on April 12, 1985.

from WVHA, QMC paid $10,000 by check to Caddick's mother, Stella Greenfield, in August 1993. This $10,000 check, paid with Fischer's approval, was marked "consulting fees"--even though Greenfield never performed any services for QMC. Greenfield sent the proceeds of the $10,000 check to Caddick, pursuant to Caddick's instructions.

In January 1994, a QMC bookkeeper sought an invoice to correspond with the earlier $10,000 check to Greenfield. The bookkeeper received an invoice dated August 1, 1993. A notation appeared on the invoice in Fischer's handwriting, indicating that the payment was for a "loan origination fee."

Another attempt to cover up QMC's $10,000 payment to Caddick apparently was made after QMC defaulted on the $1.2 million loan from WVHA and that default became the subject of an investigation and widespread publicity. In this cover-up attempt, Caddick allegedly approached QMC's vice-president, Charles Kramer, with a "contract" for programming services Caddick purportedly had performed for QMC. Caddick allegedly asked Kramer to sign and backdate the "contract" to create a retroactive justification for the $10,000 payment. However, Kramer refused.

## C. WVHA's Receipt of Federal Benefits

To establish that Fischer had violated 18 U.S.C. §§ 666(a)(1) and (a)(2), the Government was required to prove that WVHA was an agency receiving, in any

5

one year period, "benefits in excess of $10,000" under a federal assistance program. 18 U.S.C. § 666(b).[6] At trial, the Government introduced evidence that WVHA was a county agency responsible for operating two county hospitals. The Government also introduced testimony from WVHA's director of finance that "most health care organizations collect a majority of their funds from programs that are funded by the federal government." Asked to give an example of how much money WVHA specifically collected in 1993 from the federal government

---

[6] In relevant part, 18 U.S.C. § 666 provides as follows:

> (a) Whoever, if the circumstance described in subsection (b) of this section exists–
>> (1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof–
>>> (A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that–
>>>> (i) is valued at $5,000 or more, and
>>>> (ii) is owned by, or is under the care, custody, or control of such organization, government, or agency; or
>> . . . .
>> (2) corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local, or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more;
> shall be fined under this title, imprisoned not more than 10 years, or both.
>
> (b) The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

18 U.S.C. § 666(a)-(b).

under the Medicare program alone, WVHA's director of finance testified that WVHA had collected between ten and fifteen million Medicare dollars in 1993.

Later on, WVHA's director of finance explained further that different government programs pay differently. WVHA's director of finance then testified:

> A specific example is that we get paid, hospitals get paid a fixed amount from the federal government on in-patient Medicare patients, patient[s] who are greater than the age of 65. So raising the prices for services that are primarily used for individuals in that group has no impact. There's no increase in revenue.

Thus, according to the testimony of WVHA's director of finance, even if the hospital charges the patient an increased amount for services, the hospital is paid only a fixed amount from Medicare for those services.

## II. DISCUSSION[7]

### A. Scope of § 666(b)

The statutory prerequisite for a conviction under 18 U.S.C. § 666 is that the organization or agency affected by the fraud, unauthorized conversion, bribery, or other prohibited act "receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." 18 U.S.C. § 666(b). In the present

---

[7] The issues we discuss here involve statutory interpretation and sufficiency of the evidence. We review de novo issues of statutory interpretation. United States v. MacAllister, 160 F.3d 1304, 1306 (11th Cir. 1998). We also review de novo sufficiency of the evidence, viewing the evidence in the light most favorable to the Government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict. United States v. Trujillo, 146 F.3d 838, 845 (11th Cir. 1998).

case, the primary issue is whether WVHA received "benefits" under a federal assistance program for purposes of § 666(b). After review, we find that WVHA's receipt of between ten and fifteen million dollars in Medicare funds qualified as receipt of "benefits" under a federal assistance program and that the Government presented sufficient evidence to satisfy the requirements of 18 U.S.C. § 666(b).

This Court previously addressed the scope of § 666(b) in United States v. Copeland, 143 F.3d 1439 (11th Cir. 1998). At issue in Copeland was whether Lockheed, a prime contractor for the United States Department of Defense, qualified as an organization receiving "benefits" for purposes of § 666(b). Id. at 1441. Defendant Copeland, a manager at one of Lockheed's plants, had been convicted of violating 18 U.S.C. § 666 by accepting bribes from individuals including co-defendant Winders. Id. at 1440. In turn, defendant Winders had been convicted of violating 18 U.S.C. § 666 by giving bribes to co-defendant Copeland. Id. On appeal, the defendants argued that their convictions under § 666 should be reversed because the Government had failed to prove that Lockheed met the requirements of § 666(b). Id.

In reviewing the defendants' claims in Copeland, this Court examined the statutory language and construed § 666(b) as requiring that the "benefits" an organization or agency receives from the federal government be linked to some form of federal assistance. Id. at 1441. Specifically, this Court recognized that

8

organizations engaging in contractual relationships with the federal government would fall within the scope of the statute, if those "contractual relationships constitut[ed] some form of 'Federal assistance.'" Id. This Court also determined that "organizations engaged in purely commercial transactions with the government" were excluded from the scope of § 666(b) because those organizations were not in relationships involving some form of federal assistance. Id.

Based on the evidence at trial, this Court in Copeland concluded that Lockheed's relationship with the government did not come within the scope of § 666(b) because Lockheed's transactions as a defense contractor were "purely commercial." Id. at 1442. Nothing in the record indicated that Lockheed had received "benefits" under a federal program involving a contract or any other form of federal assistance. Id. The record did contain evidence that Lockheed received funds from the government through its defense contracts, but those funds were not "benefits" within the meaning of § 666(b) because those funds were not received under a federal program involving federal assistance. Id. Instead, those funds were received as a result of "purely commercial transactions with the government." Id. Because this statutory prerequisite of receiving "benefits" under a program of federal assistance was not met, this Court vacated Copeland's and Winders's convictions under § 666. Id.

9

**B. Sufficiency of the Government's Evidence Under § 666(b)**

The evidence in the present case contrasts sharply with that in Copeland. Whereas Lockheed received federal dollars through purely commercial transactions, WVHA, as an agency responsible for the administration of two hospitals, actually received payments from the federal government under several federal assistance programs. For example, evidence introduced at the trial in this case clearly established that, in 1993, WVHA received between ten and fifteen million dollars under the federal Medicare assistance program. In fact, WVHA's finance director's testimony indicated that the ten to fifteen million dollars WVHA collected under the Medicare program in 1993 was paid directly to WVHA for providing health care services to covered individuals.

Section 666(b) provides that the "benefits" an organization receives under a federal program can be in the form of "a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." 18 U.S.C. § 666(b) (emphasis added). Because WVHA received payments under a federal assistance program, WVHA received a type of "benefits" expressly covered by § 666(b). Thus, the statutory prerequisite for Fischer's convictions under § 666 was satisfied.

Having reached this result based entirely on the plain language of § 666(b), we normally would not examine the legislative history of the statute. See United States v. Copeland, 143 F.3d 1439, 1441 (11th Cir. 1998). However, as this Court

10

observed in Copeland, some circuits have found § 666(b) to be ambiguous on its face.  Id.  As a result, it is worth noting that the legislative history of § 666(b) also supports our conclusion.  The statute's legislative history indicates that the language of § 666(b) is to "be construed broadly, consistent with the purpose of this section to protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery."  S. Rep. No. 225, 98th Cong., 2d Sess. 369-70 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3510-11.  In this case, our determination that WVHA is an agency receiving "benefits" within the meaning of § 666(b) serves the statute's purpose of protecting from fraud, theft, and undue influence by bribery the money distributed to health care providers, and WVHA in particular, through the federal Medicare program and other similar federal assistance programs.[8]

**C.  "Target Recipient" Analysis Not Required**

---

[8] Although the legislative history may seem to indicate otherwise, we observe  that this Court already has held that the government is not required to prove a direct link between the federal assistance and the fraudulent conduct in issue.  United States v. Paradies, 98 F.3d 1266, 1288-89 (11th Cir. 1996) (recognizing that a "connection to federal funds" is not required for a conviction under § 666).  Instead, § 666(b) only requires the government to prove that WVHA is an agency that receives "benefits in excess of $10,000" under a federal assistance program, as we have already determined that the government has done.  See 18 U.S.C. § 666; United States v. Copeland, 143 F.3d 1439, 1441 (11th Cir. 1998).   Thus, here the government was not required to prove a direct link between the Medicare funds received by WVHA and either Fischer's fraudulently obtaining and converting the $1.2 million loan from WVHA or Fischer's bribing an agent of WVHA in connection with the $1.2 million loan.

11

Fischer's main argument that the Medicare funds received by WVHA are not "benefits" for purposes of § 666(b) relies on a narrow construction of "benefits" that does not consider the context in which the term appears. Fischer primarily bases his argument on a district court decision in United States v. LaHue, 998 F. Supp. 1182 (D. Kan. 1998). In LaHue, the court concluded that a group of physicians who received Medicare funds and, more specifically, funds under Medicare Part B,[9] as payment for their services had not received "benefits" for purposes of 18 U.S.C. § 666(b). Id. at 1186-87, 1192.

After reviewing the framework of the Medicare statute, the LaHue court concluded that Medicare patients, and not Medicare providers, are the "target recipients" of Medicare "benefits". Id. at 1185-86. In particular, the court observed that, under Part B of the Medicare program, patients may either pay their health care providers and then seek reimbursement from Medicare or may assign their "benefits" to their providers, allowing the providers to collect funds from Medicare. Id. at 1185. The LaHue court acknowledged that, under this framework, Medicare Part B providers "ultimately receive funds traceable to a federal program," but the court emphasized that these providers "do so only through patient payments or assignments." Id. at 1187. Thus, according to LaHue, the physicians' group involved in the case received funds under Part B of Medicare

_____

[9] The Medicare program is divided into two parts, Part A and Part B. See 42 U.S.C. § 1395, et seq.

12

after those "benefits" had reached the "target recipients" of the program. Id. at 1187-88.

Finding the language of § 666(b) ambiguous as to whether these payments and assignments of funds that are traceable to Medicare Part B, but received "after" the funds have reached the "target recipients," qualify as "benefits" for purposes of § 666(b), the LaHue court examined the statute's legislative history. Id. at 1188-89. The LaHue court interpreted this legislative history, along with the few cases that have examined and applied § 666(b), as consistent with the court's conclusion that once the funds from a federal program reach the "target recipient," they cease to be "benefits" under a federal assistance program for purposes of § 666(b). Id. at 1187-90.

We decline to adopt LaHue's "target recipient" analysis. We first note that, in this case, the testimony of WVHA's finance director indicated that in 1993 WVHA received ten to fifteen million dollars from the Medicare program. The finance director's testimony did not clearly establish whether WVHA received funds directly from the Medicare program or received funds as an assignee under Part B or even Part A of the federal program. Thus, there is a possibility in this case that WVHA received funds directly from the Medicare program without having been assigned the right to receive those funds by a patient. However, even if WVHA received funds as an assignee, the plain language of § 666(b) does not

13

distinguish between an organization, government, or agency that receives "benefits" directly under a federal program and an organization, government, or agency that receives "benefits" as an assignee under a federal program.

Moreover, the language of § 666(b) also does not require that "the organization, government, or agency receiv[ing] . . . benefits" be the "target recipient" of the federal program at issue. Instead, the language focuses on the source of the "benefits", requiring that the "benefits" have been received "<u>under</u> a Federal program <u>involving</u> a grant, contract, subsidy, loan, guarantee, insurance, or other form of <u>Federal assistance</u>." 18 U.S.C. § 666(b) (emphasis supplied). Thus, in context, the use of the term "benefits" serves to emphasize not that the recipient must be a "target recipient", but rather that the funds must have been received by the organization, government, or agency as part of an "assistance" program, rather than a purely commercial transaction–the federal government's purchase of goods from a contractor, for example. See <u>United States v. Copeland</u>, 143 F.3d 1439 (11th Cir. 1998).

## III.  CONCLUSION

For all of the foregoing reasons, Fischer's convictions and sentence are **AFFIRMED.**