# United States Court of Appeals
## For the First Circuit

No. 00-2029

UNITED STATES,

Appellee,

v.

LUIS E. DUBÓN-OTERO,

Defendant - Appellant.

No. 00-2030

UNITED STATES,

Appellee,

v.

JORGE L. GARIB-BAZAIN,

Defendant - Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Selya, Circuit Judge,

John R. Gibson,* Senior Circuit Judge,

---

* Of the Eighth Circuit, sitting by designation.

and Lipez, <u>Circuit Judge</u>.

———————————————

<u>David W. Roman</u>, with whom <u>Brown & Ubarri</u>, <u>Frederick P. Hafetz,</u> <u>Susan R. Necheles, Elizabeth M. Johnson</u>, and <u>Goldman & Hafetz</u> were on brief, for appellant Dubón.
  <u>Scott A. Srebnick</u>, with whom <u>Howard M. Srebnick</u> and <u>Black,</u> <u>Srebnick, & Kornspan</u> were on brief, for appellant Garib.
  <u>Richard A. Friedman</u>, United States Department of Justice, with whom <u>Guillermo Gil,</u> United States Attorney, and <u>Maria Dominguez and</u> <u>Thomas F. Klumper</u>, Assistant United States Attorneys, were on brief, for appellee.

———————————————

May 29, 2002

———————————————

JOHN R. GIBSON, Senior Circuit Judge.  Luis Dubón-Otero and

Jorge L. Garib-Bazain appeal from their convictions, after a joint

trial, for conspiring to steal property worth more than $5,000 from an

organization receiving more than $10,000 in federal benefits in any

one-year period.  See 18 U.S.C. §§ 371, 666(a)(1)(A) and (2) (1994).

They argue that there was a constructive amendment of the indictment,

that there was insufficient evidence to convict them, and that the jury

instructions were defective.  They also challenge the makeup of their

jury and the appointment of the United States Attorney.  Garib also

appeals his conviction for making false declarations before a grand

jury in violation of 18 U.S.C. § 1623 (1994).  We affirm.

Advanced Community Health Services (Health Services) was

incorporated in the Commonwealth of Puerto Rico in 1987 as a for-profit

corporation.[1]  Dubón, a lawyer, and Garib, a doctor, were shareholders

and directors.  Dubón served as legal advisor to Health Services and

Garib as the Medical Director of Patient Services.  Dr. Yamil Kourí-

Perez was a consultant from the Harvard Institute for International

---

[1] Health Services later became a non-profit corporation.

-3-

Development who, together with Jeanette Sotomayor-Vazquez, the administrative director, and Angel Luis Corcino-Mauras, the comptroller, conducted the day-to-day operations of Health Services.

Dubón and Garib were charged with conspiring to use Health Services funds to pay personal expenses and make political payoffs. The principal witness at trial was Corcino, whose testimony painted a picture of Kourí as the primary conspirator. Kourí and Sotomayor were indicted along with Dubón and Garib, but tried separately. They were convicted, and we affirmed in United States v. Sotomayor-Vazquez, 249 F.3d 1 (1st Cir. 2001).

In January 1988, Health Services contracted with the Municipality of San Juan to provide services for AIDS patients. The initial contract provided that the Municipality would pay Health Services a flat fee of $3.2 million per year for these services. Because under the contract Health Services became "the exclusive source of AIDS counseling and professional services in San Juan," United States v. Dubón-Otero, No. 97-091, slip op. at 10 (D. P.R. March 3, 2000), federal monies began to find their way to Health Services.

The Government introduced evidence regarding the payment of these federal monies to Health Services, and the ways in which Dubón and Garib diverted these funds. This evidence will be discussed in greater detail below, as we discuss the various arguments made by Dubón and Garib on appeal.

I.

Dubón and Garib argue that the district court erred by allowing a constructive amendment of the indictment. Specifically, they complain the court admitted evidence that the funds the defendants had stolen were federal or public funds, which may have been entrusted to Health Services but never lost their federal or public character. Appellants argue admission of this evidence constituted a constructive amendment of the indictment. They construe the indictment as limiting the charge against them to conspiring to steal only Health Services funds.

> A constructive amendment occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecution or court after the grand jury has last passed upon them. An amendment of the indictment is considered prejudicial per se and grounds for reversal of a conviction whether it is brought about by a literal alteration of the words of the indictment, a jury instruction which modifies the offense charged in the indictment, or the admission of evidence of an offense not charged by the grand jury.

United States v. Dunn, 758 F.2d 30, 35 (1st Cir. 1985) (internal quotation marks and citations omitted).[2]

The charging paragraph of the indictment alleged that Dubón and Garib, "as agents of an organization which received benefits in

_____

[2] Because our ultimate conclusion is that there was no constructive amendment in this case, we need not address the Government's argument that the rule of per se reversal of cases where there has been a constructive amendment has been modified by the Supreme Court's recent decision in Neder v. United States, 527 U.S. 1 (1999) (holding that failure to instruct jury on element of crime is subject to harmless error review).

-5-

excess of $10,000.00 under a Federal program involving a grant, or other form of Federal assistance," conspired with others to "embezzle, steal, and obtain by fraud, and without authority knowingly convert to the use of a person not the rightful owner, and intentionally misapply property worth at least $5,000.00 owned by such organization, that is, monies in excess of $2,000,000.00 in program funds." (Emphasis added.) (Paragraph Thirty-Seven of the indictment read: "the defendants embezzled, stole and obtained by fraud, in excess of $2,000,000.00 of public funds." (Emphasis added.)) The indictment incorporated Counts Two through Thirty-Four as overt acts, which further described the funds in question as "owned by or under the care, custody, and control of [Health Services]." (Emphasis added.). Under Count I, the indictment charged Dubón and Garib generally with conspiracy to violate § 666. Section 666 seeks, among other things, to punish any agent of an organization receiving more than $10,000 in federal benefits in any one-year period, who "embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies property that--(i) is valued at $5,000 or more, and (ii) is owned by, or is under the care, custody, or control of such organization." 18 U.S.C. § 666(a)(1)(A) (emphasis added).[3] While the elements of the charged crime

_____

[3] The statute provides in relevant part:

(a) Whoever, if the circumstances described in subsection (b) of

-6-

have to "appear primarily from the language in the indictment . . .

common sense suggests that such a citation should not be entirely

ignored where, as here, it so plainly reinforces what is implicit in

the text." United States v. McLennan, 672 F.2d 239, 243-44 (1st Cir.

1982).

Dubón and Garib cite United States v. Pheaster, 544 F.2d 353

---

this section exists--
 (1) being an agent of an organization, or of a State, local,
 or Indian tribal government, or agency thereof--
  (A) embezzles, steals, obtains by fraud, or otherwise
  without authority knowingly converts to the use of any
  person other than the rightful owner or intentionally
  misapplies, property that--
   (i) is valued at $5,000 or more, and
   (ii) is owned by, or is under the care, custody,
or   control of such organization, government, or
agency;
  . . .
shall be fined under this title, imprisoned not more than 10
years, or both.
(b) The circumstance referred to in subsection (a) of this
section is that the organization, government, or agency
receives, in any one year period, benefits in excess of $10,000
under a Federal program involving a grant, contract, subsidy,
loan, guarantee, insurance, or other form of Federal assistance.
(c) This section does not apply to bona fide salary, wages,
fees, or other compensation paid, or expenses paid or
reimbursed, in the usual course of business.
(d) As used in this section--
 . . .
 (5) the term "in any one-year period" means a continuous
 period that commences no earlier than twelve months before
the  commission of the offense or that ends no later than
twelve  months after the commission of the offense. Such
period may  include time both before and after the commission
of the  offense.

18 U.S.C. § 666.

-7-

(9th Cir. 1976), for the proposition that overt acts cannot supply an element missing from the charging paragraph.  See id. at 361 ("[A] conspiracy indictment's specification of overt acts cannot be used to supply the allegation of a critical element completely missing from the charging language.").  However, Pheaster itself recognized that "reference to the overt acts is appropriate to confirm an otherwise commonsense interpretation of an allegation which is included in the charging language," id. at 362, and thus is of no help to Appellants.

A primary objective of the rule against constructive amendment of indictments is to ensure defendants have notice of the charges they must defend against.  United States v. Kelly, 722 F.2d 873, 876 (1st Cir. 1983); cf. United States v. Delano, 55 F.3d 720, 729 (2d Cir. 1995) ("[W]e have consistently permitted significant flexibility in proof, provided that the defendant was given notice . . . .").  The indictment here put Appellants on notice that they would have to defend against exactly the type of evidence of entrustment of which they now complain.  If Dubón and Garib chose not to defend against that type of evidence, that choice does not make the district court's permitting the Government to go forward with such evidence a constructive amendment.

II.

The indictment in this case charged a conspiracy covering the years 1989 to 1994.  Dubón and Garib argue the district court erred by

-8-

refusing to acquit them following trial because the Government failed to prove Health Services received any federal benefits before 1991. They contend that amounts received in 1989 were commercial payments, not federal benefits, and thus their convictions could not be predicated on pre-1991 conduct.[4] Since there would be no way of assuring the jury did not rely on pre-1991 conduct in reaching its conclusion, the conviction could then not stand. See Yates v. United States, 354 U.S. 298, 312 (1957) ("[W]e think the proper rule to be applied is that which requires a verdict to be set aside in cases where the verdict is supportable on one ground, but not another, and it is impossible to tell which ground the jury selected."). The Government, on the other hand, argues it proved Health Services received federal benefits beginning in January 1989. In the alternative, the Government argues the Supreme Court's decision in Neder v. United States, 527 U.S. 1 (1999), modified Yates to allow harmless error review, and the error here was indeed harmless.[5]

We review a denial of a Rule 29 motion for acquittal de novo. United States v. Czubinski, 106 F.3d 1069, 1073 (1st Cir. 1997). We also review de novo the question of what type of transactions

---

[4] As we explain below, federal monies are not synonymous with federal benefits for purposes of a conviction under § 666.

[5] As in Part I above, our ultimate conclusion here precludes our having to address the Government's alternative Neder argument.

constitute benefits under § 666. See United States v. Peery, 977 F.2d 1230, 1233 n.2 (8th Cir. 1992) ("[D]etermining whether section 666 applies to Peery's conduct is a question of law."). Finally, we review de novo the question of whether the Government presented sufficient evidence at trial to prove Health Services in fact received benefits under § 666, viewing the evidence in the light most favorable to the Government. See United States v. Otero-Mendez, 273 F.3d 46, 50 (1st Cir. 2001); United States v. Fischer, 168 F.3d 1273, 1276 n.7 (11th Cir. 1999), aff'd Fischer v. United States, 529 U.S. 667 (2000); United States v. Copeland, 143 F.3d 1439, 1442 (11th Cir. 1998).

Appellants concede Health Services received federal benefits beginning in 1991. The question we must answer is whether Health Services' receipt of federal monies between 1989 and 1991 constituted receipt of federal benefits. Three distinct transactions are at issue. First, on January 13, 1989, Health Services deposited two checks totaling $11,862.14 from the Centers for Disease Control, a federal agency. The Centers for Disease Control had contracted with the Municipality to test members of the public for AIDS, and the Municipality subcontracted the work to Health Services. Health Services was paid directly by the Centers for Disease Control. There was evidence Health Services received another $11,124.03 from the Centers for Disease Control in August 1989 for similar work. Second, Health Services received $70,680 in 1989, and $99,729 in 1990, to

-10-

operate an assessment and intervention center for drug addicts. This money came from the Municipality. The Municipality in turn had received it from the Commonwealth, which had received it as a grant from the National Institute on Drug Abuse (the Institute), a federal agency. Third, on January 10, 1989, Health Services received $100,000 for work on a mass-media education project on AIDS. Although this money was paid by the Municipality, there was testimony from a municipal official that this payment had its source in federal funds, which passed through the Puerto Rico Department of Health to the Municipality.

The Supreme Court recently addressed the issue of what constitutes receipt of benefits under § 666 in Fischer v. United States, 529 U.S. 667 (2000).[6] In that case, the Court concluded that § 666 "covers fraud perpetrated on organizations participating in the Medicare program." Id. at 669. The Court reached this conclusion because the "nature and purposes of the Medicare program," id. at 671, indicated payments were made "for significant and substantial reasons in addition to compensation or reimbursement," such as assisting "the hospital in making available and maintaining a certain level and

_____

[6] Fischer was decided after the convictions in this case. Nonetheless, it applies on direct appeal. See United States v. Ochs, 842 F.2d 515, 519 (1st Cir. 1988) ("[I]n our direct review of the convictions entered below, we are bound by McNally[ v. United States, 483 U.S. 350 (1987)], even though it was decided after the completion of proceedings in the district court.").

quality of medical care, all in the interest of both the hospital and the greater community," id. at 679-80.  The Court stated that the term "benefits" is used in the statute in its ordinary sense, id. at 677, and since the hospitals themselves derive significant advantage from participating in Medicare, they could be said to be deriving benefits within the meaning of § 666, "a statute we have described as 'expansive,' 'both as to the [conduct] forbidden and the activities covered,'" id. at 678 (quoting Salinas v. United States, 522 U.S. 52, 56 (1997)).  The Court saw this conclusion as consistent with the language of the statute, which "indicates that Congress viewed many federal assistance programs as providing benefits to participating organizations," as well as "Congress' expansive, unambiguous intent to ensure the integrity of organizations participating in federal assistance programs."  Id. at 678.  The Court set out the following test:

> To determine whether an organization participating in a federal assistance program receives "benefits," an examination must be undertaken of the program's structure, operation, and purpose.  The inquiry should examine the conditions under which the organization receives the federal payments.  The answer could depend, as it does here, on whether the recipient's own operations are one of the reasons for maintaining the program.

Id. at 681.

The Court rejected the notion that Medicare payments made to

the hospitals were compensation of the type excluded by § 666(c).[7] In addition to the fact that monies paid included sums to enhance the hospitals themselves, Medicare placed conditions on recipient hospitals, "unlike the case of a contractor whom the Government does not regulate or assist for long-term objectives or for significant purposes beyond performance of an immediate transaction." Id. at 680.[8] The Court also rejected the contention that since the primary beneficiary of Medicare was the individual patient, the hospitals could not also be said to have received a benefit under the program. Id. at

---

[7] Subsection (c) states: "This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business."

[8] A number of cases from other circuits, which preceded Fischer, also support the proposition that, while purely commercial payments made by the government "as a commercial entity, such as payments for supplies or equipment," do not constitute benefits under § 666, the mere presence of quid pro quo does not preclude a finding of federal benefits. United States v. Rooney, 986 F.2d 31, 33-34 (2d Cir. 1993) (holding that loan proceeds received from the Farmers Home Administration constituted benefits); see United States v. Copeland, 143 F.3d 1439, 1441 (11th Cir. 1998) (holding that money paid to Lockheed Aeronautical Systems Company as the prime contractor for the Department of Defense did not constitute benefits under § 666); United States v. Marmolejo, 89 F.3d 1185, 1189-91 (5th Cir. 1996) (holding that funds provided to a county jail, in exchange for the jail housing federal prisoners, constituted benefits), aff'd sub nom. Salinas v. United States, 522 U.S. 52 (1997). Those cases distinguish purely commercial transactions from "monies distributed through 'Federal programs,' for which there is 'a specific statutory scheme authorizing the Federal assistance in order to promote or achieve certain policy objectives.'" Rooney, 986 F.2d at 35 (quoting S. Rep. No. 98-225, at 369 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3510); see Copeland, 143 F.3d at 1441-42; Marmolejo, 89 F.3d at 1190.

677. Finally, the Court refused to endorse the notion that all that was required for funds to constitute benefits under § 666 was to establish that they came from a federal program.  Id.

When we apply Fischer to this case, we conclude, and the jury supportably could have so found, that the Institute payments that Health Services received constituted benefits.[9]  The Institute[10] monies in this case were originally disbursed under a grant to the Puerto Rico Department of Anti-Addiction Services.  Anti-Addiction Services in turn made a grant of a portion of these funds to the Municipality, which then paid Health Services.  Dubón acknowledges this money was "clearly a grant intended to assist AIDS patients in Puerto Rico," and "may also have been intended to assist the Commonwealth or the Municipality in that it enabled these government entities to assist citizens with drug addictions."  Dubón questions, however, "whether the program under which this money was paid was intended to aid or promote the well being of [Health Services]."  We point out that the Supreme Court in Fischer only said that "[t]he answer [to the question of whether there are

_____

[9] We thus need not decide the character of the Centers for Disease Control or mass-media education project payments.

[10] The National Institute on Drug Abuse "supports over 85 percent of the world's research on the health aspects of drug abuse and addiction."  National Institute on Drug Abuse, Welcome to the NIDA Website, at http://www.drugabuse.gov/NIDAWelcome.html (last visited May 17, 2002).  Part of its mission "is to ensure the rapid and effective dissemination and use of the results of that research to significantly improve drug abuse and addiction prevention, treatment, and policy."  Id.  Distribution of funds is authorized under 21 U.S.C. § 1177 (1994).

-14-

federal benefits under § 666] could depend . . . on whether the recipient's own operations are one of the reasons for maintaining the program. . . . Other cases may present questions requiring further examination and elaboration of the term 'benefits.'" 529 U.S. at 681-82 (emphasis added).

One of the Institute's goals in making grants is to "insure care of good quality, in general community facilities." 21 U.S.C. § 1177(f).[11] Under its contract with the Municipality, Health Services was "the exclusive source of AIDS counseling and professional services in San Juan . . . supplying AIDS services under a federally financed

_____

[11] Congress has authorized the Secretary of Health and Human Services, "acting through the National Institute on Drug Abuse," to make grants and "enter into contracts with individuals and public and private nonprofit entities" in order to provide "educational programs, technical assistance for the development, demonstration, and evaluation of drug abuse prevention, treatment, and rehabilitation programs," and in so doing to "accord a high priority to applications for grants or contracts for primary prevention programs." 21 U.S.C. § 1177(a). The Secretary is to "require coordination of all applications for programs." § 1177(c). Projects and programs for prevention and treatment services are subject to specific requirements. They should, "whenever possible, be community based, insure care of good quality in general community care facilities . . . and be integrated with, and provide for the active participation of, a wide range of public and nongovernmental agencies, organizations, institutions, and individuals." § 1177(f). "[W]here a substantial number of the individuals in the population served by the project or program are of limited English-speaking ability[, they should] . . . utilize . . . outreach workers fluent in the language spoken," and "identify an individual who is fluent both in that language and English" to provide guidance to individuals of limited English-speaking ability. Id.

program." Dubón-Otero, No. 97-091, slip op. at 10.[12] Therefore, the Institute would naturally intend its monies to assist Health Services in providing AIDS care, much as Medicare monies assist hospitals in providing patient care.

It makes no difference that Health Services received this money indirectly. It is now well established that benefits under § 666 are not limited solely to primary target recipients or beneficiaries. See Fischer, 168 F.3d at 1278 ("[T]he plain language of § 666(b) does not distinguish between an organization . . . that receives 'benefits' directly under a federal program and an organization . . . that receives 'benefits' as an assignee under a federal program."); cf. Fischer, 529 U.S. at 677-78 ("Medicare operates

_____

[12] The contract with the Municipality provides in pertinent part that:

> The Municipality must hire the services of a company with personnel that has the experience and professional knowledge necessary to design, establish, direct and manage the AIDS program of San Juan . . . . [Health Services] will utilize the equipment located at the facilities provided by the Municipality . . . . Epidemiological services will be provided in order to establish a state of alertness of the disease as well as counseling and treatment to the patients. The epidemiological activities shall be coordinated with the respective state and federal authorities. . . . [Health Services] will establish an educational program for the community in order to create public conscience especially to high risk groups. . . . The population at large will be educated regarding prevention of AIDS and the different methods of transmission.

with a purpose and design above and beyond point-of-sale patient care."). Health Services' contract with the Municipality contemplated a relationship between Health Services and the United States Government, and those operating federal assistance programs like the Institute are well aware that recipients of program funds use subgrants and subcontracts to further effectuate the program's goals. Lawrence Poole, a grants manager for the United States Department of Health and Human Services,[13] testified that "a grant award [that] is issued by an agency could and does in fact translate into subcontracts or subgrantee relationships with other organizations." Poole further testified that Health Services received federal funding as a subgrantee for the years of 1988 and 1989, and that "the requirements for each subgrantee or subcontract relationship are subject to the same requirements for accountability of federal funds and terms of the award as the actual grantee recipient of federal funds." We conclude that if the payments in <u>Fischer</u> were "made not simply to reimburse," 529 U.S. at 679, then neither were the payments here.

---

[13] The Department of Health and Human Services encompasses the National Institute on Drug Abuse. Mr. Poole described his duties as administering individual discretionary grant programs geared primarily toward provision of health care in United States territories. He had been with Health and Human Services approximately thirty years and was very familiar with their federal grant programs.

III.

Dubón and Garib argue that the district court erred in denying their motions for acquittal for insufficient evidence. Pointing to the fact that the indictment charged them with conspiring to steal from Health Services, they assert the Government did not prove the crucial element of lack of consent of the corporation. They cite United States v. Burbank for the proposition that there can be no theft where "[n]o evidence [is] presented by the government to show that the transactions were not authorized by the corporation." 848 F.2d 453, 454 (4th Cir. 1988).[14] They contend Health Services' shareholders and board of directors consented to the transactions at issue and therefore there was no theft.

In reviewing a challenge to the sufficiency of the evidence, "[t]he verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80 (1942); see United

_____

[14] Because we ultimately conclude that there was sufficient evidence for the jury to find a lack of valid authorization, Appellants' Burbank argument need not detain us. We have serious concerns about some of the broad language in Burbank, but it suffices to say that while it is one thing to decide that the consent of sole or co-owners can preclude conviction for interstate transport of stolen money (as was the case in Burbank under 18 U.S.C. § 2314 (2000)), it would be quite another to extend that holding to this case involving a conspiracy to embezzle or steal funds from an organization receiving funds from the federal government, especially given the attendant complexities of 18 U.S.C. § 666.

-18-

States v. Mena-Robles, 4 F.3d 1026, 1031 (1st Cir. 1993) (stating that the issue in a sufficiency challenge is "whether the evidence and reasonable inferences therefrom, taken as a whole and in the light most favorable to the prosecution, would allow a rational jury to determine beyond a reasonable doubt that the defendants were guilty as charged").

The Government presented evidence that between 1987 and May 1991 Dubón received $10,000 per month from Health Services as a legal retainer, although Health Services' board of directors had authorized a retainer of only $5,000. Someone had tampered with the original board minutes to show authorization for a monthly retainer of $10,000, allowing Dubón to funnel the additional $5,000 per month to Kourí. Specifically, the director of the word processing center where the minutes were transcribed testified that the original page of the minutes setting forth the retainer as $5,000 was replaced in another set of minutes with a page showing the retainer as $10,000. The page showing the retainer as $10,000 was a different consistency than the rest of the minutes and was not produced at the same word processing center. Corcino testified the additional $5,000 was going to Kourí to pay Kourí's home rent and credit card bills. Corcino further testified that Kourí could not be on Health Services' payroll because Kourí was under contract with the Harvard Institute for International Development, which in turn had a contract directly with the Municipality of San Juan.

-19-

The Government also presented evidence that Garib employed a personal housekeeper, as well as a secretary for his private practice, using Health Services' money. Corcino, Health Services' comptroller, testified that for a long time he was not aware that Health Services was paying for a private secretary and personal housekeeper for Garib, and that in his opinion such payments constituted an unauthorized diversion of Health Services funds for personal use. The housekeeper testified that the signature on the timesheets bearing her name was not hers. The secretary testified that while she was paid by Health Services, ninety-nine percent of her time was spent on tasks related to Garib's private practice.

Finally, there was evidence at trial that Appellants also used Health Services assets to purchase political support, which Health Services was dependent upon for its funding. Before the San Juan mayoral election of 1988, Garib allegedly loaned a $19,000 video camera to one of the candidates, Jose Granados-Navedo. The camera had been purchased with a Health Services check. Garib and Kourí later met with Granados to discuss Health Services providing other financial support for his campaign.

To generate more cash, Garib, Sotomayor, and Corcino then met with Antonio Fernandez, the owner of IMA Productions, and presented him a Health Services check made out to IMA in the amount of $60,000 and signed by Garib and Sotomayor. Only some of this money was intended to

pay for services performed by IMA. Garib asked Fernandez to endorse the check and cash it--or else write separate IMA checks payable to other persons who had not rendered services--so Garib could recover the excess in cash. Garib explained Health Services had an urgent need of cash to make certain payments that it could not make by company check. When Fernandez refused to participate, Garib stated that he had solved the problem in another way. Garib later met with Granados and gave him a box containing more than $100,000 in cash.

Granados lost the election. After the new administration assumed office, payments on the AIDS contract were delayed. Kourí later told Corcino that he had taken care of the problem by arranging for $5,000 a month to be paid to the candidate who had won the election, Mayor Hector Luis Acevedo, and $5,000 to the Director of the Health Department of the Municipality, Dr. Freddie Borras. Regular payments by the Municipality on the AIDS contract then resumed. The $10,000 monthly payments were raised by cashing Health Services checks issued to persons who had performed no services. Several of these checks were signed by Garib and Dubón. Dubón's law firm was also involved in cashing a series of these Health Services checks at Dubón's direction, with at least one of the checks being issued to Dubón's son, who had performed no services. Toward the end of 1990 Dubón told Corcino, "I am not going to sign for that [expletive] any longer." He did not, however, object to the continued diversion of the funds.

-21-

Viewing this evidence in the light most favorable to the Government, as we must, we conclude that a rational jury could find beyond a reasonable doubt that Dubón and Garib were participants in a conspiracy to use Health Services funds to pay personal expenses and make political payoffs as charged in the indictment. The evidence of informal alterations of the board minutes as a means to funnel funds to Kourí, of the apparent use of a forged signature to divert Health Services' funds to pay for Garib's personal housekeeper, of the use of a Health Services' employee to do work almost exclusively for Garib's private practice, and of the clandestine efforts to turn Health Services checks into cash are all evidence from which a jury could find that defendants "without valid authority" embezzled, stole, or obtained by fraud money or property.

## IV.

Dubón and Garib challenge a number of the district court's decisions regarding jury instructions. We address each in turn, recognizing that when alleged errors involve particular instructions' adequacy in explaining the law, as they do here, "[w]e must look at the entire charge, in light of the evidence, and determine whether, taken as whole, the court's instructions fairly and adequately submitted the issues in the case to the jury." United States v. Woodward, 149 F.3d 46, 69 (1st Cir. 1998).

### A.

The district court denied defendants' requested jury instructions, including instructions which required the Government to prove that the actions of defendants were designed to "cheat Health Services," that Health Services was the "victim," and that authorization by Health Services was thus a defense.[15] Instead, the district court instructed the jury that it was sufficient to find that the funds at issue were "something of value in excess of $5,000 in connection with federal funding" and "under the care, custody or control" of Health Services.

We conclude the district court did not err in its instructions to the jury. The district court instructed that theft involved taking property without authority and that embezzlement

_____

[15] One of the requested instructions said that "to act with intent to defraud means to act knowingly with the intent or the purpose to obtain, deceive, or cheat [Health Services] out of money or property." There was also a request to instruct the jury that

> The government must prove beyond a reasonable doubt that [Health Services] did not authorize the expenditure. One of the ways by which a corporation can authorize a payment is by the board of directors. If the board of directors of Advanced Community Health Services authorized an expenditure, then this expenditure was not theft or embezzlement.

Other instructions were requested, but since they all embody variations of the same theme as the ones above, we need not set them all out.

involved taking property under one's control belonging to another.[16] Its further instructions that there was a crime if the money or property stolen "was owned by or was under the care, custody, or control of [Health Services]," was proper in light of our discussion above in Part I.  The instructions taken as a whole fairly and adequately informed the jury of the applicable law.

B.

Dubón and Garib argue the district court erred by refusing to instruct the jury on the requested definition of federal benefits. We have already set out the applicable law as to what constitutes federal benefits under § 666 in Part II above.

Dubón and Garib requested the following instructions: (1) Not every payment by the federal government to an organization constitutes

---

[16] The district court instructed:

Embezzlement is the fraudulent appropriation of property with [sic] one properly entrusted with its possession.
It is to willfully convert to one's own use, without authority, another's money and property, of which the wrongdoer acquired possession validly, of [sic] some office, employment or position of trust.
Theft, also known as larceny, is the act of stealing or taking of property without the owner's consent.  It is the fraudulent taking of personal property for [sic] money belonging to another from his possession or from the possession of some person holding the same for him without his consent, with an intent to deprive the owner of the value of the same and to appropriate it to the use or benefit of the person taking it.

-24-

federal "benefits" as required by the statute; (2) Federal money paid to a private corporation as payment of fees for services already rendered by the corporation does not qualify as federal benefits; (3) Payments made by the federal government to a private corporation as part of an ordinary commercial transaction do not qualify as federal benefits; (4) Money paid to a corporation is a federal benefit if the corporation was required to "administer" the money under an agreement with the government or to "disburse" the money to others.  The district court, meanwhile, tracked the statutory language in instructing the jury.[17] Cf. United States v. Paradies, 98 F.3d 1266, 1289 (11th Cir. 1996) (concluding there was no plain error in district court's failure to instruct on an element of § 666, where the instructions "tracked the statutory requirements" and the evidence at trial was sufficient for a jury to find the element in question satisfied).[18]

---

[17] The district court instructed the jury that in order for them to return a guilty verdict, Health Services must have received

> in any one-year period benefits in excess of $10,000 under a federal program involving a grant, a contract, a subsidy, a loan, a guarantee, insurance or other form of federal assistance.  This section [666] does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed in the usual course of business.

The district court reiterated this element of § 666 later.

[18] Dubón and Garib cite Marmolejo, 89 F.3d at 1189, for the proposition that "[t]he plain language of § 666 is ambiguous in defining 'Federal Program' and 'Federal Assistance,'" and

We conclude the first three of the requested instructions were adequately covered by the district court when it instructed the jury that "legitimate, valid, bona fide salary, wages, fees, or other compensation paid or expenses paid or reimbursed in the ordinary course of business" did not constitute benefits. As to the fourth requested instruction, Dubón and Garib direct us to no authority supporting such a definition of federal benefits under § 666, nor do we believe that such is a complete statement of the law in this respect.[19] We cannot conclude that there is error in refusing an offered instruction where we are left to speculate as to an appellant's legal underpinning for the proposed instruction. One may argue that United States v. Rooney, 986 F.2d 31 (2d Cir. 1993), provides some support. In that case the Second Circuit stated that "[i]n each of the

therefore more was required than mere recitation of the statutory language. However, there can be little doubt that the National Institute on Drug Abuse (which we have concluded is the source of the federal benefits at issue here) is a federal assistance program. Thus, even if we were to find error in the district court's failure to define "federal program" and "federal assistance" in its instructions, such error would be harmless. See Bastien v. Goddard, 279 F.3d 10, 16 (1st Cir. 2002) (instructional error "entitles appellant to a new trial on his claim only if it had a prejudicial effect").

[19] Garib acknowledges the requested instructions were written "so that the jury could differentiate between the payments Health Services received in 1989 (which were not 'benefits'), and the federal grants it received after February 1991 (which were 'benefits')." Since we have already concluded that Health Services did receive benefits in 1989, the requested instructions buckle under their own weight.

cases [enumerated by the Senate Report to illustrate situations § 666 is intended to include], the organization . . . provided the Federal government with a service by administering a government program." Id. at 35  But that discussion of legislative history was dictum, since the court there had already concluded that benefits were present on the basis of § 666's statutory language.  Id. at 34.  More importantly, a court's refusal to instruct in the language of an appellate opinion does not justify reversal.  See Kent v. Smith, 404 F.2d 241, 244 (2d Cir. 1968) ("[I]t is generally not helpful to take quotations from the opinions of appellate courts, that were never intended to be used as instructions to juries, and submit these in the form of requests to charge.").

        We are aware that the Supreme Court in Fischer stated that "[t]o determine whether an organization participating in a federal assistance program receives 'benefits,' an examination must be undertaken of the program's structure, operation, and purpose."  529 U.S. at 681.  The record before us demonstrates that evidence was before the jury relevant to these issues, and the district court, in ruling on the motion for acquittal, expressly analyzed these issues.[20]

---

[20] The district court stated:

Defendants' requests are premised upon their enduring contention that federal money paid to a private corporation which performs a service for the government can not constitute federal benefits.
        We have disagreed, and continue to disagree,

-27-

The district court did not err in instructing the jury in this respect.

C.

Dubón and Garib argue that the district court erred by refusing to instruct the jury that it could only return a verdict of guilty on the basis of conduct occurring after Health Services first received federal benefits. The requested instruction stated:

> An expenditure that occurred before [Health Services] ever received any federal benefits is not a violation of 18 U.S.C. section 666. The government must prove that the defendant agreed to an unauthorized expenditure or expenditures that occurred after [Health Services] received federal benefits. Therefore, if the defendant agreed only to an expenditure or expenditures occurring before Health Services received any federal benefits, you must find the defendant not guilty of count 1.

---

> with such a contention. To summarize, we find that [Health Services] was not in a purely commercial relationship with the federal government. First, the contract between the Municipality of San Juan and [Health Services] provided that [Health Services] was to be the exclusive source of AIDS counseling and professional services in San Juan and that the Municipality maintained administrative and supervisory roles over [Health Services]. This fact alone clearly indicates more than a commercial relationship. Moreover, we find that the contractual relationship itself is a form of a federal assistance, supplying AIDS services under a federally financed program. See United States v. Copeland, 143 F.3d 1439, 1441 (11th Cir. 1998) ("[O]rganizations engaged in contractual relationships with the federal government would fall within the scope of [section 666], if those 'contractual relationships constitut[ed] some form of Federal assistance.'") (internal citations omitted). We instructed the jury accordingly.

Dubón-Otero, No. 97-091, slip op. at 10-11.

-28-

The district court denied this request.

The relevant statutory language states: "[T]he circumstance [that must exist for there to be a federal crime] is that the organization . . . receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." § 666(b). The statute further defines one-year period as "a continuous period that commences no earlier than twelve months before the commission of the offense or that ends no later than twelve months after the commission of the offense. Such period may include time both before and after the commission of the offense." § 666(b)(5).

Garib now argues the instruction given by the district court allowed the jury to return a guilty verdict on the basis of conduct occurring before Health Services received any federal money at all, much less federal benefits.[21] For instance, the jury could have found Garib guilty on the basis of conduct occurring only in 1988 (before Health Services received any federal monies), added twelve months to get into 1989 (when Health Services received over $10,000 in federal funds), and thus satisfied the instruction. Garib argues federally

_____

[21] Because Dubón's conduct all involved 1989, and because we have already concluded that there was indeed sufficient evidence for the jury to find that Health Services had received federal benefits in 1989, we only need to consider this argument as it pertains to Garib.

criminalizing his 1988 conduct in that way would exceed the government's authority under the Spending Clause of the United States Constitution, U.S. Const. art. I, § 8, cl. 1.  See Fischer, 529 U.S. at 689 (Thomas, J., dissenting) ("We have held that the spending power requires, at least, that the exercise of federal power be related 'to the federal interest in particular national projects or programs.'") (quoting South Dakota v. Dole, 483 U.S. 203, 207 (1987)); United States v. Zwick, 199 F.3d 672, 687 (3d Cir. 1999) ("Applying § 666 to offense conduct, absent evidence of any federal interest, would appear to be an unconstitutional exercise of power under the Spending Clause.").

In support of his contention that the jury could have found him guilty based solely on 1988 conduct, Garib points to the Government's argument to the jury in summation:

> And you will recall that Mr. Poole testified that on January 10 of 1989, federal funds were received through that grant. And you will recall that that grant was in excess of $10,000.  And why is that date important?  Because, as the judge will instruct you on what the law is for federal program fraud, the government has to prove that $10,000 were received in any one calender [sic] year period either before or after the commission of the offense.  And if you take the date of January 10th of 1989 and go back one year, it takes you to January 10th of 1988, close to the date on which [Health Services] was created.

Garib and Dubón requested a special verdict that would have required the jury to identify what conduct it was basing its verdict on, but the Government objected, and the district court did not submit a special verdict form.

-30-

The Government responds that the indictment charged a conspiracy beginning in 1989 and that the jury was instructed accordingly.  It argues the 1988 conduct was only presented to show the existence of a conspiracy.  It further argues that even if 1988 conduct was a basis for the jury's verdict, there in fact was federal interest in the form of pending contracts.  Finally, the Government argues any error was harmless because the jury found that a conspiracy existed, that Dubón's conduct occurred in 1989, and that Garib, as a co-conspirator, was responsible for that conduct.

We conclude there was no error.  To begin with, the instruction requested by Dubón and Garib was not a correct statement of the law, because what the Government had to prove was that the defendants agreed to join a conspiracy to steal from Health Services and that an overt act in furtherance of that conspiracy occurred after § 666 became applicable.  The requested language was simply too narrow. Most importantly, however, the district court's instructions as to the scope of the indictment properly limited the jury:

> So let's now talk about conspiracy.  For you to find a defendant guilty of conspiracy, you must be convinced that the government has proved each of the following elements beyond a reasonable doubt.
> First, that between in or about <u>January of 1989</u> up to and including February of 1994, the agreement specified in the indictment and not some other agreement or agreements existed between at least two of the defendants charged in the indictment; and second, that the defendants Luis Dubon and Jorge Garib each willfully joined in that agreement; and third that at least one of the conspirators committed at least one overt act in the an [sic] effort to

-31-

further the purpose of the conspiracy.

(Emphasis added.)

As for the Government's argument to the jury in summation, it was not the subject of a timely objection and we will not say it was plain error to permit it.[22] See Chute v. Sears Roebuck and Co., 143 F.3d 629, 630 (1st Cir. 1998) ("[T]he court of appeals will consider a forfeited objection only if an error was committed, if the error was 'plain' (i.e. clear under current law), if the error was prejudicial, and if review is needed to prevent a miscarriage of justice.") (citing United States v. Olano, 507 U.S. 725, 733-37 (1993)).

V.

Garib challenges his perjury conviction. See 18 U.S.C. § 1623 (imposing punishment on anyone who, under oath in any proceeding before any grand jury, knowingly makes any false material declaration). Garib's perjury charge stems from testimony he gave before the grand jury. As part of that testimony he denied giving political

---

[22] Garib also points to the district court's reimbursement order following the conviction as evidence of the district court's alleged confusion on this issue. In that order, the district court required Garib to repay the federal government for losses it incurred as a result of Garib's conduct in 1988. Even if we were to agree that the reimbursement order suggests a misunderstanding of the law on the part of the judge, it does not invalidate the judge's instructions. The judge need not be correct in his reasoning, so long as he was correct in his decision being challenged on appeal. See Helvering v. Gowran, 302 U.S. 238, 245 (1937) ("In the review of judicial proceedings the rule is settled that if the decision below is correct, it must be affirmed, although the lower court relied upon a wrong ground or gave a wrong reason.").

contributions, or loaning a video camera, to Granados. He also denied asking Fernandez to sign a $60,000 check so Garib could generate cash. Garib now argues he was denied a fair trial on his perjury charge for two reasons. First, he argues that by improperly instructing the jury as to § 666's "one-year-period" and Health Services' authorization defense, the court effectively directed a verdict as to materiality. Because we have concluded above that the district court's instructions on these matters were not improper, Garib's argument on this first point must fail. Second, Garib argues the district court's instructions as to perjury removed the Government's burden of proving the falsity of the statements at issue. The district court instructed the jury that:

> In order to sustain its burden of proof for the purpose of making a false declaration before the federal grand jury as charged in Count Thirty-five of the indictment, the government must prove the following four essential elements beyond a reasonable doubt. One, that the defendant Jorge Garib gave testimony under oath before a federal grand jury; number two, that the defendant Jorge Garib made <u>the false material statement</u> as detailed in the indictment during that testimony; three, the defendant Jorge Garib knew that the statements were false when he gave the testimony; and four, that the statement or representation was material, meaning that it had a natural tendency to influence or was capable of influencing a decision or an action, whether or not it actually influenced or deceived anyone. I also instruct you that truth is a defense to perjury.

(Emphasis added.) We see no error in the district court's instructions because they adequately covered the Government's burden of proof. <u>See</u> <u>United States</u> v. <u>Watson</u>, 623 F.2d 1198, 1204 (7th Cir. 1980) (upholding

similar instruction).[23]

### VI.

Finally, Dubón and Garib challenge the makeup of their jury and the appointment of the interim United States Attorney.

### A.

Dubón and Garib argue that their right, as criminal defendants, to a petit jury selected from a fair cross-section of the community, see Taylor v. Louisiana, 419 U.S. 522, 528 (1975) ("the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial") (citing also 28 U.S.C. § 1861), is denied in Puerto Rico by the exclusion of potential jurors who are not proficient in English- -an exclusion which they allege systematically excludes the poor.  We previously held a similar challenge to be unavailing in United States v. Benmuhar, 658 F.2d 14 (1st Cir. 1981).  Dubón and Garib seek to distinguish Benmuhar as having been decided in part upon the absence of any viable alternative, while here they suggested simultaneous translation.  However, we stated in United States v. Flores-Rivera,

---

[23] Garib raises three other arguments, which we conclude are without merit.  As phrased in his brief, they are: "The District Court's Flawed Instructions On § 666 Propelled The Prosecutor To Argue That Dr. Garib Had A Motive To Lie To The Grand Jury"; "The District Court's Endorsement Of The Flawed Theory Of Prosecution Invited The Prosecutor To Assail Dr. Garib's Character And Prejudice His Right To A Fair Trial"; "The Cumulative Effect Of The District Court's Errors Deprived Dr. Garib Of A Fair Trial."

that it is "the overwhelming national interest served by the use of English in a United States court," which "justifies conducting proceedings in the District of Puerto Rico in English and requiring jurors to be proficient in that language." 56 F.3d 319, 326 (1st Cir. 1995) (quoting United States v. Aponte-Suarez, 905 F.2d 483, 492 (1st Cir. 1990)). This justification is independent of the presence or lack of any viable alternatives. Accordingly, we reject Appellants' contention.

## B.

Dubón and Garib challenge the appointment of interim United States Attorney Guillermo Gil as statutorily and constitutionally defective. As Appellants themselves recognize, this issue has been definitively resolved in the Government's favor. United States v. Hilario, 218 F.3d 19, 22 (1st Cir. 2000).

## VII.

Accordingly, we affirm.